Case No.:  1:18-cv-00051-JJM

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND
PROVIDENCE DIVISION

ADAM COBB,
Petitioner,

v.

UNITED STATES OF AMERICA,
Respondent.

MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE
PURSUANT TO 28 U.S.C. §2255
(1:16-cr-00006-JJM-PAS-1)

AMENDED
MEMORANDUM OF LAW

ADAM COBB, Petitioner pro se
09925-070
Federal Medical Center
Post Office Box 14500
Lexington, Kentucky 40512

"There is no other relationship in human affairs exactly analogous to that of attorney and client. It is a relation that in its intimacy and responsibility is an example of supreme trust and confidence. By it we ask another for the time and occasion to be ourselves. It is as if for the time being we transfer our individuality to another who then becomes our mind, our voice, and even in a degree, our conscience. It is not strange that this relation from the earliest times has been most closely guarded, and that there are inseparably connected with it certain rules of honor which to disregard put the brand of infamy upon the transgressor. To violate this sacred trust [of advocacy] and be disloyal to a client is deservedly the unpardonable sin of an attorney. By this betrayal he sinks lower than by any other act of dishonor."

The Problem of Proof, by Albert S Osbone,
Introduction by John Henry Wigmore (author of
Wigmore on Evidence) Bender Co., 1922.


"The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor – indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."

Berger v United States, 295 U.S. 78, 88, 55
S.Ct. 629, 633, 79 L.Ed 1314 (1935).

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT — p.i
STATEMENT OF RELEVENT FACTS — p.ii
28 U.S.C. §2255 — p.1
Pro Se STANDARDS — p.2
GROUND ONE - Ineffective Assistance of Counsel — p.3
   - Performance — p.4
   - Prejudice — p.5
   - Procedural Bar on §2255 — p.7
   - Excusal of Procedural Default — p.8
   - Failure to Investigate — p.9
   - Waiver of Indictment and Plea Agreement Advice — p.19
   - Petitioner's Ante-Plea Claims Overcome Waiver/Procedural Bar — p.24
   - Ineffective Assistance of Counsel Prejudice Continues to Prejudice Petitioner in §2255 — p.36
     -Dallas Airport Stop — p.36
     -Search of RI Home — p.42
GROUND TWO - Prosecutorial Misconduct — p.50
   - Search Warrants, Warrant Affidavits, Evidence etc — p.51
   - Failure to Seek an Indictment Against Petitioner — p.53
   - Overlap Between Ineffective Assistance of Counsel and Prosecutorial Misconduct — p.57
GROUND THREE - Judicial Error — p.61
   - Speedy Trial Significance of Majistraits Conduct — p.62
GROUND FOUR - Jurisdictional and Constitutional Claims Arising Out of Conduct of Law Enforcement — p.64
MULTI-GROUNDS ISSUES — 
   - Constitutional and Statutory Violation of Speedy Trial — p.66

IN SUMMARY — p.78
PRAYER FOR RELIEF — p.83

# JURISDICTIONAL STATEMENT

This Court has jurisdiciton for the instant Motion and proceedings brought by Petitioner under 28 U.S.C. §2255, Case Number 1:18-cv-00051-JJM, as the underlying criminal proceedings were held in this same Court pursuant to 28 U.S.C. §1291. The sentencing court is the designated forum for challenges to the validity of a federal prisoner's conviction or sentence, as authorized by 28 U.S.C. §2255. Miller v. United States, 564 F.2d 103 (1st Cir. 1977), cert den 435 U.S. 931, 55 L.Ed. 2d 528, 98 S.Ct. 1504 (1978). See also, Rules Governing §2255 Motions, Rule 4(a), (§2255 motions shall be presented to district court judge who presided at movant's trial and sentencing). A §2255 "must be filed in the sentencing court" because it attacks errors "at or prior to sentencing." Pack v. Yusuff, 218 F.3d 448, 451 (5th Cir. 2000). A court that has decided any issue affecting the terms of a petitioner's sentence, including the acceptance of a defendant's guilty plea, is a "sentencing court." See, e.g., United States v. Romero-Vilca, 850 F.2d 177, 178-79 (3rd Cir. 1988). A "sentencing court" is also one that has accepted a defendant's plea bargain. United States v. Flores, 616 F.2d 840, 842 (5th Cir. 1980).

## STATEMENT OF RELEVANT FACTS

The following Statement of Relevant Facts is to present a general chronology and commentary of the pertinent events as shown in the written record: docket, warrants, affidavits, etc.

1. A federal investigation is begun in January, 2015, as shown by the designation "1:15" in the case headings.

2. On March 4, 2015, a RI state warrant is issued to search the home of Petitioner.

3. On March 18, 2015, the federal case receives the #1:15-MJ-115-PAS.

4. On March 31, 2015, the number remains 1:15-MJ-115-PAS.

5. On April 2, 2015, without explanation, the federal case receives a new case number: #1:15-MJ-129-PAS.

6. In other documentation from the Court, the federal case also receives yet another Case number on the same day, April 2, 2015. That case number is 1:15-MJ-130-PAS.

7. Docket Number 3, filed on April 2, 2015 contains exhibits of previous documents, including the RI state search warrant, search warrant affidavit, and item inventory, etc.

8. Docket Number 3 contains a Criminal Complaint for the "115-PAS" case, and includes an AFFIDAVIT, that on page 45 of 48 displays an anomoly.  The anomoly is that the final signing page appears to have been pre-written and pre-printed with the phrase "SUBSCRIBED and SWORN before me this ____ day of JANUARY 2015."  January is crossed out and March is written in by hand, however the presence of "January" indicates that Federal authorities were originally preparing the document for a January signature by the Magistrate, to include the exact name of the specific Magistrate they chose for their submission.
For reasons unstated, the January-planned document was not submitted until AFTER the RI search was already completed. The presence of January not being corrected suggests possibly improper or illegal maneuvering between state and federal authorities.

9. Docket#3 contains the State of Rhode Island Search Warrant Application and Affidavit of Rhode Island officer Michael J. MORSE as Exhibit 1.  Exhibit 1 shows that the Search Warrant was authorized on March 4, 2015.

10. There is no written request for any Federal officer or agent to accompany or participate in the RI search of Petitioner's residence.

11. There is no written authorization or permission granted by the RI Judge for the RI search to include any Federal officer or agent, neither for accompaniment nor participation.

12. HSI Agent RICHARDSON, in his Criminal Complaint/Search Warrant Application/Affidavit states that he participated in the RI state search of Petitioner's residence.

13. At the time of the RI Search (March 5, 2015), RICHARDSON was not a member of the RI police. As such he was not partici- pating in the search under the color of state law. As a federal officer, he has no jurisdiction to participate in state searches, without the authorization and/or consent of the Judge who authorized the search.

14. RICHARDSON participated in the RI state search while while being under color of federal law, an officer of federal authority, under federal jurisdiction, but without any federal judicial authority to participate in the state search.

15. RICHARDSON lacked the requisite jurisdictional authority to participate in the search on March 5, 2018.

16. The RI search was based upon information that was originally from theprivate company TUMBLR, who presented the informa- tion to a quasi-governmental investigative organization (who themselves possess no arrest nor prosecution power).

17. The RI search was based on information that in no way implied any existence of Ms.             ·; Petitioner's fiance. The RI search was limited to seeking out the evidence attached to the TUMBLR-originated allegations.

18. The TUMBLR-based allegations strictly involved images between Petitioner and another individual (NOT Ms.        , who were consensually sharing internet communications. Both the Petitioner and other individual were of the age of majority respective to their states of residency at the time, and furthermore were bound by the TERMS OF SERVICE at the TUMBLR site to be truthfully representational of that fact, both to TUMBLR and to other users.

19. As such, any 'role-play' of ages less than that of consent could arguably be viewed as exaggerations, incontext of the TUMBLR Terms of Service/End User Agreements entered into by parties.

20. Petitioner believed that the other user was of the age of consent, due to the TUMBLR terms and agreements, and also

due to the admission by the other party of having reached the age of majority for the State of Maryland.

21. Any and all data/information regarding the relationship between Petitioner and Ms. Helena Cross was private, consensual, and had received (the uneccessary, but welcomed) belssing from Ms. Cross' parents.

22. Any and all data/information regarding the relationship, communications between, or consensual actions between Petitioner and Ms. Cross were not part of the scope of the original RI State warrant.

23. Due to their subsequent discovery by state forensic officers scanning Petitioner's property, information/data concerning Petitioner and Ms. Cross became known to state authorities.

24. The "inevitable discovery" doctrine regarding the data/information cited in #23 is inapplicable in that the State of RI search was corrupted/tainted by the presence and influence of HSI RICHARDSON. In turn, RICHARDSON used the Petitioner/Cross data to improperly/illegally obtain the federal search warrant or to advance the federal case, which until that time had remained dormant since January, 2015.

25. If State of RI officers had executed their warrant without any federal participation in this case, any inevitable discovery claims would be under the color of state law exclusively.

26. HSI RICHARDSON based his search warrant and affidavit from a combination of the RI affidavit, and the inclusion of "inevitable discovery" data/information to which he would never had access, if but for his unauthorized involvement and participatiion in RI criminal investigations.

27. The State of RI never brought criminal proceedings against Petitioner in any of the above issues, to include the "inevitable discovery" material. Petitioner now posits that the reason goes to the illegality of the search due to the federal involvement, or a decided lack of willingness to prosecute the matter under RI law, or through a previously decided strategy for RI to "do the dirty work" and then present the entire matter to HSI RICHARDSON, either with or without agreements on future quid pro quo arrangements.

28. On March 4, 2015, Petitioner was returning from a brief deployment on a carrier in the South China Sea where he was conducting intelligence activities for the squadron. His US Government orders routed him from Okinawa to Tokyo to Dallas to New York.

29. On the orders of HSI RICHARDSON in RI, US Customs and Border Protection (CBP) in Dallas Texas, stopped, searched and seized

Petitioner, in the absence of a search warrant, <u>Miranda</u> warning, or the issuing of a receipt for property seized.

30. Petitioner was initially flagged at the entry kiosk. He was taken to secondary screening, where a number of the travelling public waited to see an officer. The room had a window and door facing the arrivals area. A uniformed officer and two plain clothed CBP officers soon emerged and addressing Petitioner as "Dr Cobb" ordered him to follow them into a "restricted area" via a number of hallways.

31. Petitioner and the three officers arrived at a windowless room far away from the public - the noise of the arrivals area was not in evidence. They asked Petitioner if he was carrying national security/classified files and a whole range of questions regarding his work for the US Navy in context of his travel.

32. CBP officers questions shifted from national security and travel to questioning in support of a criminal investigation. Over a period of one and a half to two hours a forth officer arrived. He was uniformed an wore the rank of Major. Petitioner was alone in this restricted area with the CBP officers. At no time was he read a <u>Miranda</u> warning nor was he advised he was free to leave. Petitoner did not feel free to leave nor did he know how given the design of the windowless room. No water or rest room was offered.

33. CBP officers sezied Petitioner's iPhone. They removed it from his precence. No search warrant was presented and no receipt was provided.

34. On April 3, 2015, Petitioner was arrested.

35. On April 3, 2015, Petitioner began being represented by attorneys John E. MACDONALD and Robert H HUMPHREY.

36. On April 16, 2015, the Government filed for an Extension of Time to Indict, which was GRANTED by Magistrate SULLIVAN that same day.

37. SEVEN more Motions for Extension of Time to Indict were filed by the Prosecutor, all of which were GRANTED by Magistrate SULLIVAN.

38. The Extensions were:

| Dkt. | Date |
|------|------|
| 10 | 4-16-15 |
| 16 | 7-07-15 |
| 21 | 8-07-15 |
| 23 | 9-08-15 |
| 27 | 10-13-15 |
| 29 | 11-23-15 |
| 35 | 1-08-16 |

39. None of the Extensions of were objected to by Counsel.

40. None of the Extensions of Time were specifically noted in the Docket as being "for the ends of justice", "excused from Speedy Trial calculations", or any similar term.

41. In a Motion before the Honorable Court, Dkt#75, the Prosecution states that no Grand Jury ever received the case.

42. On September 8, 2015, previous counsel withdrew, and Francis, J FLANAGAN entered his NOTICE OF ATTORNEY APPEARANCE.

43. During imprisonment at the Wyatt Detention Center, Jordan Monroe approached Petitioner and informed him of his plan to kill a federal agent (HSI RICHARDSON) and thereafter to blow up a federal building.

44. Petitioner rejected Monroe's appeals and warned the government of the threat posed by Monroe, resulting in a proffer session with HSI RICHARDSON and Monroe's AUSA. Monroe was never charged with any crime related to this matter.

45. On Counsel's advice, Petitioner agreed to proceed on the Criminal Information filed against him. Petitioner also on Counsel's advice waived the indictment in his case. January 27, 2016, and February 3, 2016, respectively.

46. On Counsel's advice, on January 27, 2015, Petitioner entered into a Plea Agreement with the Government, and on February 24, 2016, Petitioner entered his plea before Judge MCCONNELL.

47. On February 14, 2017, Judgement was entered in Petitioner's case. 60 months of incarceration, $100.00 special assessment, $25,000 fine. New Case #: 1:16-cr-00006-JJM-PAS-1.

48. Petitioner could file no Direct Appeal due to the Plea Agreement terms advised by Counsel for him to sign.

49. Petitioner's original complaint was for §2252(a)(2) Receipt and Distribution. The Pending Count at Sentencing was for §2252(a)(2) Distribution.

50. February 6, 2018, Petitioner files by U.S. Mail his Motion under §2255. New case #: 1:18-cv-00051-JJM.

## Title 28, United States Code, Section 2255

"A proceeding under Title 28, United States Code, Section 2255, is an independent and collateral inquiry into the validity of the conviction.... The 2255 motion is an independent suit. The action is civil in nature when governed by the rules and statutes applicable to civil actions." Wright, et al., Federal Practice and Procedures, Volume 2, Section 590 (1969)(cited in Espada v. United States, 355 F.Supp. 690, U.S. Dist. LEXIS 15310 Dist. PR, 1973)). The remedy afforded by §2255 is one to vacate, to set aside, or correct a sentence. Id.

A federal prisoner may challenge a sentence imposed by a federal court, if (1) the sentence violates the Constitution or laws of the United States; (2) the sentencing court lacked jurisdiction to impose the sentence; (3) the sentence exceeds the statutory maximum; or (4) the sentence "is otherwise subject to collateral attack." 28 U.S.C. §2255(a). A sentence is "otherwise subject to collateral attack" if a petitioner shows that the proceedings suffered from "'a fundamental defect which inherently results in a complete miscarriage of justice.'" United States v. Addonizio, 442 U.S. 178, 185 (1979)(quoting Hill v. United States, 368 U.S. 424, 428 (1962)).

- 1 -

## Pro Se Standards

Pro se litigants' pleadings are held to less stringent standards than pleadings drafted by lawyers. Haines v. Kerner, 404 U.S. 519, 520 (1972); see, e.g., Rodi v. Ventetuolo, 941 F.2d 22, 23 (1st Cir. 1991)(pro se brief is read with an extra degree of solicitude); United States v. Mosquera, 845 F.2d 1122, 1124-25 (1st Cir. 1988)(pro se §2255 motion construed as not unduly conclusory). "The Court must accept a plaintiff's allegations as true and construe them in the light most favorable to the plaintiff, and review pleadings of a pro se plaintiff liberally." Tucker v. Wall, U.S. Dist. LEXIS 7140, 2010 WL 322155 at 8 (Dist. R.I., 2010). Despite liberal reading, a complaint must give the non-moving party fair notice of what the claim is and the grounds on which it reasts, as well as a plausible entitlement to relief. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009): Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 559 (2007). Pro se submissions should not be read "too mechanically"; rather, they should be considered holistically with a heave dose of common sense. Rodriguez-Vives v. P.R. Firefighters Corps. of P.R., 743 F.3d 278, 283 (1st Cir. 2014). See also, Rodi v. New Eng. Sch. of Law, 389 F.3d 5, 13 (1st. Cir. 2004)(court liberally construes pro se submissions, dismissing only if plaintiff "hold[s] out no hope" of success).

## GROUND ONE - Ineffective Assistance of Counsel

"In all criminal prosecutions, the accused shall enjoy the right...to have Assistance of Counsel for his defense." <u>U.S. Constitution, Amd. VI</u>. The Sixth Amendment Right to Counsel is the right to <u>Effective</u> Assistance of Counsel. <u>McMann v. Richardson</u>, 397 U.S. 759, 771 n.14 (1970). This applies to both retained and appointed Counsel (see, <u>Cuyler v. Sullivan</u>, 446 U.S. 335, 344-45 (1980)) in both federal and state prosecutions. <u>Johnson v. Zerbst</u>, 304 U.S. 458, 463 (1938). The purpose of the right to counsel is to guarantee assistance "when the accused [is] confronted with both the intricacies of the law and the advocacy of the public prosecutor," <u>United States v. Ash</u>, 413 U.S. 300, 309 (1973), because "[t]he framers of the Sixth Amendment recognized that a defendant in a criminal case is not likely to be sufficiently learned in the law effectively to assert all of his guaranteed rights." <u>United States v. Plattner</u>, 330 F.2d 271, 274 (2nd Cir. 1964)(citing <u>Johnson v. Zerbst</u>, <u>Id</u>.). "[T]he purpose of the effective assistance guarantee of the Sixth Amendment is...to ensure that criminal defendants receive a fair trial." <u>Strickland v. Washington</u>, 466 U.S. 668, 689 (1984).

In <u>Strickland</u>, the Supreme Court established a two-prong test for ineffective assistance claims. One - the defendant must prove that counsel's performance fell below an objective standard of reasonableness. Two - the deficient performance of counsel prejudiced the defendant, resulting in an unreliable or

- 3 -

or fundamentally unfair outcome in the proceedings. Id. at 687-88, 694 (accord. Confske v. United States, 290 F.3d 437, 441 (1st Cir. 2002). Per the instructions in Strickland, a reviewing district court must:

> "...judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Id. at 690.

## Performance

The "performance prong is highly deferential to counsel's choices, and informed strategic decisions are virtually unchallengable" because courts must indulge a strong presumption of reasonable conduct on the part of counsel. Because of this, "the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Strickland, at 689, quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955). The defendant must show that counsel's advice or conduct was not "within the range of competence demanded of attorneys in criminal cases." Hill v. Lockhart, 474 U.S. 52, 56 (1985)(quoting McMann, 397 U.S. at 771.

## Prejudice

The Strickland method to assess prejudice is to question "whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt." Id. at 695; Lema v. United States, 987 F.2d 48, 51-52 (1st Cir. 1993). To prevail, a defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, at 694. A reasonable probability is one that is sufficient to undermine confidence in the outcome." Id. at 694. The unprofessional error or failure by counsel may even be a single incident or event. "[T]he right to effective assistance of counsel...may in a particular case be violated by even an isolated error of counsel if that error is sufficiently egregious and prejudicial." Murray v. Carrier, 477 U.S. 478, 496 (1986); Prou v. United States, 199 F.3d 37, 47 (1st Cir. 1999)("A single, serious error...can support a claim of ineffective assistance of counsel.").

## Prejudice may be presumed under certain circumstances

Alternatively, Strickland (at 692) and its partner case, United States v. Cronic, 466 U.S. 648, 658-61 (1984) have identified instances where a presumption of prejudice exists, namely, an actual or constructive assistance of counsel failure. Cronic provides that if counsel "fails to subject the prosecution's case to meaningful adversarial testing," the adversarial process itself becomes presumptively unreliable. Cronic, 466 U.S. at 659.

This presumption of prejudice can exist within a narrow range of circumstances. Prejudice is presumed in three catagories of cases: (1) denial of counsel, (2) where counsel is burdened by an actual conflict of interest, and (3) various types of state interference. Smith v. Robbins, 528 U.S. 259, 287 (2000); Cronic, 466 U.S. at 658-61; Strickland, 466 U.S. at 692. Presumption of prejudice is assumed both in actual denial of counsel and in constructive denial of counsel. Penson v. Ohio, 488 U.S. 75 (1988); Strickland, Id. Under the Cronic constructive denial of counsel standard, the petitioner must demonstrate that he was denied counsel such that there was no meaningful adversarial testing, that "in some cases, the performance of counsel may be so inadequate that, in effect, no assistance of counsel is provided." 466 U.S. at 654 n.11. The Court stated in Gideon v. Wainwright, 372 U.S. 335, 344 (1963), that "lawyers in criminal courts are necessities, not luxuries." The Cronic Court further stated, "to hold otherwise could convert the appointment of counsel into a sham and nothing more than a formal compliance with the Constitution's requirement that an accused be given assistance of counsel." Id. at 654. The Sixth Amendment requires an adversarial process with the accused represented and assisted by "counsel acting in the role of an advocate," and if the process loses its character as a confrontation between adversaries, the constitutional guarantee is violated. Id. at 656-57; (see also Evitts v. Lucey, 469 U.S. 387, 394 (1985)(A defense attorney "must play the role of an active advocate.").

Procedural Bar on §2255

\*   Within context of claims of Ineffective Assistance of Counsel

The Supreme Court held in Massaro v. United States, 538 U.S. 500, 509 (2003), that the failure to raise ineffective assistance of counsel claims on direct appeal does not bar a prisoner from bringing the claim in §2255 proceedings. This includes a challenge to those issues previously waived, forfeited, or not objected to by Counsel where such conduct is evidence of or subsequence of the claimed Ineffective Assistance. The Massaro exception cures the previously-held limitations set forth in United States v. Frady, 456 U.S. 152, 162-66 (1982). Generally, when Direct Appeal is available to defendant, failiure to raise the claim on Direct Appeal forecloses the issue on §2255, see, e.g., Awon v. United States, 308 F.3d 133, 142 (1st Cir. 2002), the Circuits - to include the First - agree that when a waiver to file a Direct Appeal is contained in a Plea Agreement, the underlying issues are not foreclosed where (a) the plea agreement was unknowing or involuntary; or (b) the court relied on a constitutionally impermissible factor; or (c) the challenge is based on ineffective assistance of counsel. See, e.g., United States v. Attar, 38 F.3d 727, 732-33 (4th Cir. 1994)(appellate waiver does not foreclose collateral attack on constitutional effectiveness of Counsel during process by which waiver was procured); Frederick v. Warden, 308 F.3d 192, 195 (2nd Cir. 2002)(same); Jones v. United States, 167 F.3d 1142, 1145 (7th Cir. 1999). The Plea Agreement to which Petitioner was advised to sign was a direct outgrowth from, and example of Counsel's Constitutionally ineffective assistance of Counsel. As such, it is the

- 7 -

position of Petitioner that there should exist no procedural bar to any of his claims set forth herein. Whereas a collateral attack is not a substitute for an appeal (Frady, 456 U.S. at 165)(accord. Berthoff v United States, 308 F.3d 124, 127 (1st Cir. 2002), and issues decided or not preserved on appeal will not be reviewed again by §2255 (Singleton v. United States, 26 F.3d 233, 240 (1st Cir. 1994),(Berthoff, Id. at 127); no procedural bar shall remain when "the defendant can demonstrate cause for the failure and prejudice." Id. at 127-28. Although procedural default is an affirmative defense (Sotirion v. United States, 617 F.3d 27, 32 (1st Cir. 2010)), the First Circuit - in keeping with McClesky v. Zant, 499 U.S. 467, 493-94 (1991) - has recognized that "federal courts have the authority to consider procedural default sua sponte." Rosenthal v. O'Brien, 713 F.3d 676, 683 (1st Cir. 2013)(citing Brewer v. Marshall, 119 F.3d 993, 999 (1st Cir. 1997)).

Excusal of Procedural Default

An allegation of ineffective assistance of counsel can excuse a procedural default within the First Circuit if the petitioner demonstrates both that (1) counsel's representation fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the petitioner's defense. Owens v. United States, 483 F.3d 48, 63 (1st Cir. 2007); Turner v. United States, 699 F.3d 578, 584 (1st Cir. 2012)(citing Strickland, 466 U.S. at 688). Within the cause/effect analysis, "the cause test is a 'fairly tolerant' one because 'the Constitu-

tion pledges to an accused an effective defense, not necessarily a perfect defense or a successful defense.'" Moreno-Espada v. United States, 666 F.3d 60, 65 (1st Cir. 2012)(quoting Scarpa v. Dubois, 38 F.3d 1, 8 (1st Cir. 1994)). However, a district court need not examine the 'cause' prong of Strickland first, or even at all; the analysis may begin with 'prejudice' and if none is found, 'cause' needs no examination. When 'prejudice' is found, the court must conduct the 'cause' analysis. Strickland, Id. at 694; Telvin v. Spencer, 621 F.3d 59, 66 (1st Cir. 2010); (United States v. Carrigan, 724 F.3d 39, 44 (1st Cir. 2013)). The Strickland 'reasonable probability standard' to establish prejudice in the First Circuit is for the Petitioner to demonstrate "'that the result of the criminal proceeding would have been different' if counsel had performed as the [petitioner] asserts he should have"(Rivera-Rivera v. United States, 827 184, 187 (1st Cir. 2016)(quoting Hensley v. Roden, 755 F.3d 724 736 (1st Cir. 2014), to the extent that it is "sufficient to undermine confidence in the outcome." Biron v. United States, U.S. Dist. LEXIS 162038 (D NH, 2017)(quoting Harrington v. Richter, 562 U.S. 86, 104 (2011).

## Failure to Investigate

"Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, at 691. Counsel must exercise "reasonable professional judgment in making all significant decisions." Sleeper v. Spencer, 510 F.3d 32, 38-39 (1st Cir.

2007)(internal quotations and citations omitted). "The relevant inquiry is not what defense counsel might ideally have mounted, but rather, whether the choice that he made was within the universe of objectively reasonable choices." Janosky v. St.-Amand, 594 F.3d 39, 49 (1st Cir. 2010). Counsel in criminal cases is charged with the Constitutional responsibility of conducting appropriate investigations, both factual and legal, to determine if matters of defense can be developed. United States v. Mooney, 497 F.3d 397, 404 (4th Cir. 2007). "When a lawyer advises his client to plea bargain to an offense which the attorney has not investigated, [s]uch conduct is always unreasonable." Woodward v. Collins, 898 F.2d 1027, 1029 (5th Cir. 1990). The Strickland "duty to make reasonable investigations" is elsewhere elucidated, that "[t]hough there may be unusual cases when an attorney can make a rational decision that investigation is unnecessary, as a general rule an attorney must investigate a case in order to provide minimally competent representation." Crisp v. Duckworth, 743 F.2d 580, 583 (7th Cir. 1984). Within the context of §2255 analysis,

> [It is not the] "court's commission to invent strategic reasons or accept any strategy could have followed without regard to what actually happened; when a prisoner shows that counsel's actions actually resulted from inattention or neglect, rather than reasonable judgment, the petitioner has rebutted the presumption of strategy, even if the government offers a possible strategic reason that could have, but did not, prompt counsel's course of action." (Marcrum v. Luebbers, 509 F.3d 489, 502 (8th Cir. 2007)(emphasis added).

Attorneys John E. MacDonald and Robert H. Humphrey provided Notice of Appearance on 04/03/2015, and were later replaced by attorney Francis J. Flanagan, who provided Notice of Appearance on 09/08 2015. Counsel, individually and severally failed to conduct the investigations that would be reasonable according to the facts of the case as they developed and became known to Counsel. Futhermore, Counsel failed to investigate events, locations, circumstances, individuals, the law, and the conduct of various state actors; all as related to Counsel by Petitioner at the commencement of each attorney's period of representation. In sum, Counsel failed the Strickland "duty to investigate", as well as "entirely fail[ing] to subject the prosecution's case to meaningful adversarial testing" per Cronic.

Despite 8 extensions of time 'to form a Grand Jury', one was never formed or utilized in this case. Counsel never posed the question "Why?", nor were professionally curious enough on behalf of Petitioner to investigate the matter. The record shows that they never once objected to any of these extension. It was unreasonable for Counsel to see the indictment never develop and not develop suspicions as to that fact, and then to investigate the reasons. Supplied with the facts and events leading up to the arrest, through consultation with his client, Counsel should have realized that perhaps there were crucial flaws, errors, or even Constitutional violations tainting the Prosecution's case, so much so that the Prosecution never put the case before a Grand Jury despite their repeated extensions of time for that explicit purpose.

The fact of no indictment, coupled with the detail revealed to Counsel by Petitoner clearly warranted Counsel's investigation into (A) the Prosecution's case (and its relative strangth or feasibility to garner a conviction at trial), and (B) whether any of the details or events supplied by Petitioner were errors or Consititional violations that placed the Prosecution's case in jeopardy.

Remarkably, this set of circumstances did not stir Counsel into conducting investigations. Such investigations would be invaluable in determining evidence to be suppressed, grounds for motions under Rule 29, Rule 16 and <u>Brady</u> issues, etc. It should also be noted that there was ample opportunity of time for Counsel to conduct these investigations while the Prosecution continued to wait out Petitioner. The <u>Strickland</u> duty to investigate has never been held to commence at the issuance of an indictment within the First Circuit. Absent such a holding, the duties of Counsel that are Constitutionally required commence at the attachment of Counsel following arrest.

Counsel's failure to investigate left a long list of unanswered questions that had they been investigated would have resulted in a very different trajectory of Petitioner's criminal case. Had Counsel performed to a minimally effective professional standard, the information upon which Petitioner relied to make crucial decisions would have been markedly different than the absence of information he was presented.

The following matters should have been investigated.

1. Origination of the information supplied to the U.S. Atty.

2. Validity of the above information.

3. Was the above information obtained by means that would not offend the Constitution and/or the Defendant's rights?

4. The relationship, both chronologically and by authority, between Rhode Island law enforcement and Federal law enforcement, to <u>include</u> the prosecuting bodies as well as the investigatory bodies.

5. The nature of the 'border stop' by Federal authorities of Defendant in the Texas airport.

6. Whose authority was invoked for the 'border stop', in other words, who gave the order to conduct the unusual stop?

7. What data or information was provided to the Texas airport authorities, to include any specific instructions regarding interviewing, searches, seizures, processing, documentation, photographs, etc.?

8. How exactly did the border clerk know to address the Petitioner by his title, i.e., "Doctor", when no such data appears on his standard travel information or portfoliio?

9. Could the Rhode Island authorities obtain or order Federal border enforcement officers to take action without the active cooperation or endorsement of the Federal authorities?

10. Is there a videotape of the events at the Texas airport?
    (a) to show the border stop,
    (b) to show the locked doors opened to lead to the interview,
    (c) to show the numerous corridors and turns en route to the interview area,
    (d) to show the events in the interview room,
    (e) to provide audio for the events in the interview room,
    (f) to show where the seized cellphone/smartphone was taken by Federal authorities,
    (g) to show what was done to the phone outside of Petitioner's presence,
    (h) to provide documented evidence of Petitioner's distinct feeling that he was not at liberty to leave the interview (either due to the separation from the phone, or as a result of the nature of questions, or the confusing route taken in an 'authorized personnel only' area,
    (i) to provide a 'time-stamp' authentication for the total length of the interview,
    (j) to show any/all "non-interview" portions of the activities occurring to Petitioner at the direction of Federal authorities.

11. Should the various Federal agents involved in the Texas airport stop, to include the clerk, be interviewed or otherwise deposed to confirm/deny, or elaborate on the events, especially if videotape evidence is lost or unavailable?

12. What are/were the jurisdictional ramifications of a "tip" or non-"tip" unusual border search and seizure of Petitioner and his cellphone/smartphone, when such actions occurred in the international area of the airport (or arrival area), absent such search/seizure having valid warrant for probable cause from the Federal District in Texas within which the airport is located?

13. Can a District of Rhode Island federal search warrant, or request for a border stop, or seizure order be presented in Rhode Island for a magistrate authorization, but be executed within a different Circuit and District?

14. Can a Rhode Island action either providing Affidavit for, Application for, or magistrate's authorization for search/seizure be written or authorized to have jurisdictional authority and validity within a different Federal District either in and of itself; or, optionally within the context of the Dallas District not participating/cooperating, nor any Dallas District magistrate authorizing such action?

15. What were the exigent circumstances for a search and seizure to be conducted on Petitioner's Rhode Island home, when at that time Petitioner was not at home, and was known (by simple verification) to be returning home via Texas and New York flights?

16. Rhode Island officers and Federal officers shared or collaborated at what time and to what degree during the search of the Rhode Island home of Petitioner?

17. Was the timing of the home search planned to occur during Petitioner's time at the Texas airport (and search/seizure/interview), and if so, what are the jurisdicitonal ramifications for same, the purpose of Rhode Island's officers to be involved, and the exigent circumstances?

18. Was the Federal authorities' border stop notice on Petitioner a maneuver to ensure that the search of the Rhode Island home would be conducted without his presence? Or that of Counsel? (inventory/plain sight/ Rule 41, etc.)

19. What were the exact circumstances of the border stop and did they have a firm basis in law?. Were there any cases in the First Circuit that resembled Petitioners circumstances? How did Riley v California apply to Petitioner's case? How did Miranda apply at the border and in what ways was it applicable to Petitioner's case?

20. Why was the Prosecution seeking 8 extensions of time to form a Grand Jury and yet never presented an indictment? If they had not put the case before a Grand Jury, what exactly were they doing? What Speedy indictment/trial implications flowed from the Prosecutions aversion to a Grand Jury?

21. The identities of any/all law enforcement members or invest-
    igators, or prosecutors involved in the case thus far, both
    Rhode Island State, Texas State, and both Federal (Dallas
    area) and Federal (District of Rhode Island), for purposes
    of checking their professional conduct record, prior mis-
    deeds in investigations/prosecutions, and for general
    impeachment purposes.

22. To make a first general survey of what items, evidence,
    statements, etc. should be included in Motions to Suppress.

By and through due diligence, pro se Petitioner has earnestly

engaged in familiarizing himself with Federal criminal law, to the

best of his abilities and under the restrictions and limitation

of prison-provided materials.  Yet, as shown above, pro se Peti-

tioner has developed Twenty-Two issues or concerns worthy of

investigation, all of which prior to an indictment that never

did issue from a Grand Jury.  Professional Defense Counsel did

not simply fail to investigate all of the above, Defense Counsel

failed to investigate ANY of the above, despite their legal

training and knowledge of the law, and their legal experience.

At the time following the criminal information, the naturalized

citizen originally from Australia did not know the "indict a ham

sandwich" saying due to its American origin.  Defense Counsel

**did** know that saying, and the underlying truth that indeed, given

a modicum of admissible evidence, a Federal prosecutor can obtain

a criminal indictment from the Grand Jury, even (if only proverb-

ally) a ham sandwich.

By failing to investigate, Counsel failed to put the Prose-

cution's case to the test, and it is unreasonable for Counsel

to have left all of the issues above completely uninvestigated.

There was simply no adversarial conduct exhibited by Counsel on behalf of Petitioner during the nearly ten month period between the criminal complaint and the final Extension of Time to obtain indictment request by the U.S. Attorney. Counsel did not have Petitioner's best overall interest at heart, namely, to fully dispose of the case without a Federal conviction, balanced against the extraordinary length of time that Petiioner's Life, Liberty, and Pursuit of Happiness were effectively suspended after the arrest yet without a valid indictment. There were no motions filed by Counsel to object to the Extension of Time requests by the Prosecutor. It must be noted that during this time period Petitioner was unable to continue his livelihood, working as a Professor at the Naval War College, nor as a consultant to the U.S. Military and the allies of the United States. Furthermore, Petitioner did not have freedom of travel, nor, due to the allegations within the case could Petitioner have contact with his fiance, even for purposes of matrimony. Counsel apparently believed it to be "reasonable strategy" to not investigate, nor to challenge the case on Speedy Trial grounds (Constitutional, statutory, of both), nor move for dismissal for want of prose-cution (or for insufficiency of evidence), or to bring the Prosecution's case to the true test, that of trial. It is not a stretch of the imagination to posit that a prosecutor's case that cannot secure an indictment has a nearly impossible chance of obtaining a conviction in a jury trial.

Counsel furthermore permitted, through passivity, the Pro-secutor to set the pacing for the case without challenge. With-

out any investigation, Counsel could not know whether (a) the Prosecution was truly having trouble in obtaining the indictment, or (b), that due to flaws, errors, violations, or a prosecutorial strategy to "wait out" the Defendant - or "put the Defendant on ice" to test his patience and/or resolve. Without knowing these two things, it was impossible for Counsel to provide Constitutionally competent assistance of Counsel according to prevailing norms. Any and all advice regarding the waiver of an indictment was based on generic guesswork, or with the goal of just reaching some end to litigation, and specifically **not** based on investigation, nor examination of the facts and circumstances giving rise to the Prosecutor's inability or choice to not earnest seek an indictment in the case.

Counsel's advice to waive the indictment and to furthermore sign a Plea Agreement was unreasonable, based upon the above, but moreover in context of not having provided guidance and contextual explanation to Petitioner, resepective to the role and function of the Grand Jury in the American/English adversarial court process, the 'check' on the power of the Prosecutor that the Grand Jury provides, and in this case - the very unusual development in the Prosecution being unable to meet the relatively low burden of Grand Jury indictment, put into context of the vastly more difficult task of obtaining a guilty verdict from a Petit Jury at trial (especially so in this case). The rationale was never explained to Petitioner that: if the Prosecution **could** obtain an indictment, they would have done so, because, among

other things, the Prosecutor must treat the Court with candor and must not manipulate the Court for purposes of pressuring or coercing the Defense, the Prosecution does not have an unlimited budget for this particular case, the Prosecution has a Constitutional and statutory requirement to provide a speedy disposition of cases through timely prosecution.  In other words, the greatest likelihood is that (and should have been deduced by Counsel at the time) Prosecution could not obtain the indictment. The alternative, however unlikely, would be that the Prosecution is indeed manipulating the Court, Defense, and ignoring its obligations to the Constitution, statutory law, and the Court itself.

As shown in the case law above, without investigation, it is virtually impossible to provide minimally competent assistance of counsel.  As to reasonability, it is unreasonable for Counsel to have permitted the Prosecution to continue the proceedings absent a valid indictment without making at least cursory motions per Speedy Trial, failure to prosecute, sufficiency of evidence, et al., **only to eventually concede the entire matter** through the waiver of indictment and entry into a Plea Agreement.  In short, Counsel permitted the Prosecution to win a 'war of attrition'- rather than present their case- waiting to "chalk up" a win, a conviction.

Given the unorthadox circumstances in this case, to would have been reasonable to (a) wait out the Prosecutor, (b) attack every motion for an Extension of Time, (c) challenge the entire case on Speedy Trial grounds,  (d) challenge the entire case on Due Process and

Liberty Interest grounds, (e) challenge the case on want of prosecution grounds, (f) challenge the case on "bad faith" and dilatory motive grounds, (g) appeal all rulings granting any Extensions of Time to Prosecution, (h) make motions for dismissal with prejudice, and then, if after all that the Prosecution does eventually obtain an indictment - (i) make motion(s) to examine (even if in camera) all the statements of the U.S. Attorney before each and every Grand Jury, to determine if there were any improper, false, or misleading statements made to influence the Grand Jury, and to determine how, after so many unsuccessful attempts to indict, did the Prosecutor achieve success. After an indictment, the reasonable strategy would be to continue to apply pressure for the Prosecution to continue by testing their case through Evidentiary Hearings, Discovery Requests, Subpoenaed witnesses, depositions, examinations of evidence, etc. Lastly, a jury trial, with the knowledge that the Grand Jury was close to never indicting, and that with a professional and tenacious defense, the odds for an acquittal are strong.

## Waiver of Indictment and Plea Agreement Advice

The waiver of indictment was preented to Petitioner by Counsel as "a good thing", that it would "speed things along". This advice was given to Petitioner without informing him of all the yet-untried techniques, both legal and factual, to put the Prosecution's case to the test. It is a Catch-22 situation: Counsel advises Petitioner that the indictment waiver is "a good thing." Petitioner assumes that Counsel has done all he can do.

Petitioner ends up waiving or forfeiting a multitude of benefits (strategic and otherwise) by agreeing to the **single** waiver of indictment. Petitioner does not know he is waiving or forfeiting other benefits because those details were never explained to him in proper context by Counsel. Counsel did not explain those details because he was busy advising Petitioner to waive the indictment. Petitioner could not know to ask what benefits he was collaterally waiving, because he was unaware any existed, due to Counsel's failure to inform.[1] Catch-22. At the moment of the waiver of indictment, Petitioner had no criminal record and no experience as a defendant in the criminal justice system. At that same time, Counsel knew not only Petitioner's lack of criminal history, Counsel was himself a professional attorney, experienced in the courts, and with a professional duty to advocate his client's case. Counsel's advice to waive the indictment and accept the Plea Agreement were two examples of ineffective assistance of counsel arising from Counsel's unreasonable decision to not investigate. As the two acted in tandem, the waiver and plea agreement were both entered into by Petitioner unknowingly due to the failures of Counsel.

---

1   Petitioner was never informed that the waivers carried irretractable consequences, that, should he choose to later challenge, he would be precluded from doing so, as an operation of law, namely the waiver itself. As an example, Petitioner has learned, post conviction, that the events in the Texas airport were not standard, and probably violative of his Constitutional rights, even to the point of tainting evidence and the viability of the prosecution. Given that fact, in context of the plea agreement inherent waivers such as to all Miranda and other Constitutional claims, Petitioner asserts he would not have entered into the plea, but would have proceeded to trial. had Counsel merely informed him fully.

It is well-settled that a guilty plea must be knowingly and voluntarily made. <u>Boykin v. Alabama</u>, 395 U.S. 238 (1969). "Supreme Court precedent has long made clear that '[a] criminal defendant may not be tried unless he is competent, and he may not...plead guilty unless he does so "competently and intelligently."'" <u>United States v. Kenney</u>, 756 F.3d 36, 43 (1st Cir. 2014)(quoting <u>Godinez v. Moran</u>, 509 U.S. 389, 396 (1993)(citation omitted)(quoting <u>Johnson v. Zerbst</u>, 304 U.S. 458, 468 (1938))). The First Circuit has held that to demonstrate a guilty plea or waiver of indictment was due to counsel's ineffective assistance, a petitioner "must prove by a preponderance of the evidence that his counsel unreasonably erred in permitting him to plead guilty, and that prejudice resulted." <u>Cody v. United States</u>, 249 F.3d 47, 49 (1st Cir. 2001). <u>Compare</u> to the First Circuit standard for withdrawl of a guilty plea in <u>United States v. Aker</u>, 181 F.3d 167, 170 (1st Cir. 1999)(knowing, intelligent, and voluntary)(citing Fed.R.Crim.P. 11). Petitioner's case is different from the type of intelligence of plea or voluntariness of plea case which relies on medical incapacitation, psychological distress, or other issues of cognizance that arise during Rule 11 hearings and colloquies. Petitioner was at all times mentally and physically fit and competent. However, Petitioner's waiver of indictment and guilty plea were not made in an informed manner. As shown above, Petitioner's waiver of indictment and entry of guilty plea were not, and furthermore <u>could not</u> have been in an informed manner owing to the fact that Counsel's advice in both

instances was made absent Counsel's compliance with his duty to investigate, nor were the result of reasonable assessments that established that no investigations were required (Strickland), and were furthermore the resultant advice provided to Petitioner without any meaningful adversarial challenge mounted by Counsel to test the Prosecution's case (Cronic). As such, Petitioner's waiver of indictment and his guilty plea were made based on an incorrect and incomplete set of facts about his case, and an incomplete and incorrect framework that due to Counsel's errors failed to provide a fully detailed, contextual assessment and explanation of the exactitude and the magnitude of what rights, benefits, protections, and privileges were simultaneously being waived/forfeited through or as a result of the waivers of indictment and entry of guilty plea, including and especially those not provided in writing to Petitioner at the time.

* Counsel's failures of investigation and advocacy deprived Petitioner of the knowledge to know the likelihood of success should he proceed to trial.

** Counsel's failures to provide a contextual assessment and explanation of the exactitude and magnitude of the rights, etc., that would be waived as a result of the waivers of indictment and entry of guilty plea deprived Petitioner of the knowledge to know all of the things he was waiving or forfeiting.

\*\*\* As such, and due to these two distinct types of failures by
Counsel, Petitioner was deprived of any informed method to
balance or judge his correct course of action; not due to
his own failure, but specifically due to Counsel's failure
to investigate, advocate, know the law, and present the
law and facts of the case to Petitioner, in order for Pet-
itioner to make the knowing and informed decision he is
required to make before either the waiver of indictment or
guilty plea may be accepted by the Court.

Petitioner asserts that through his explanations and details
set forth above, he has met or exceeded the relevant standard for
misadvice by Counsel affecting a defendant's action regarding
plea versus trial as stated in United States v. LaBonte, 70 F.3d
1396, 1413 (1st Cir. 1997)(it is necessary to articulate a
plausible defense that could have been raised at trial when
claiming that, but for counsel's inadequate advice, the Petitioner
would not have pled guilty and rather would have proceeded to
trial). See also, Padilla v. Kentucky, 559 U.S. ___, 176 L.Ed.
2d 284 (2010)(affirmative misadvice by an attorney and a failure
to advise about the advantages and disadvantages of a guilty plea
are treated the same when assessing whether counsel's performance
was deficient).

In respect to the Rule 11 Plea Hearing statements, the
"presumption of truthfulness of the Rule 11 statements will not
be overcome unless the allegations in the §2255 motion are
sufficient to state a claim of ineffective assistance of counsel

and include credible, valid reasons why a departure from those earlier contradictory statements is now justified." <u>United States v. Butt</u>, 731 F.2d 75, 80 (1st Cir. 1984)(citing <u>Crawford v. United States</u>, 519 F.2d 347, 350 (4th Cir. 1975)). The veracity of Petitioner's Rule 11 guilty plea, as well as entry of the plea agreement (and waiver of indictment) were, at the time of those events based upon a flawed and incomplete explanation of the law, and through failures to investigate by Counsel. If Petitioner knew then, what he has discovered and learned through his exercise of due diligence in the prison law library, he declares and affirms that he would not have waived the indictment, nor would he have entered into a plea agreement with the government - thereby obviating the need for a Rule 11 Hearing, and would have instead proceeded to trial.

## Petitioner's Ante-Plea Claims Overcome Waiver/Procedural Bar

A plea of guilty, either with or without a Plea Agreement, waives most nonjurisdictional constitutional rights. Boykin, 395 U.S. at 243; Tollett v. Henderson, 411 U.S. 258, 267 (1973) ("When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea."). However, a guilty plea does not waive all nonjurisdictional error challenges. "Neither Tollett nor our earlier cases on which it relied, e.g., Brady and McMann, stand for the proposal that counseled guilty pleas inevitably 'waive' all antecedent constitutional violations." Menna v. New York, 423 U.S. 61, 63 n.2 (1975).

"'[A defendant] is bound by his plea and conviction **unless** he can allege and prove serious derelictions on the part of counsel sufficient to show that his plea was not, after all, a knowing and intelligent act.' McMann, 397 at 774. See also Tollett; Parker v. North Carolina, 397 U.S. 790, 797-98 (1970). Under McMann, [a defendant is] required to show both that counsel's representation fell below a standard of 'reasonably competant assistance,' United States v. Bosch, 584 F.2d 1113, 1121 (1st Cir. 1978), and that counsel's incompetency rendered the defendant's decision to plead guilty an unknowing and unintelligent act." Dufresne v. Moran, 729 F.2d 18, 23 (1st Cir. 1984).

This means that it must be shown that the decision to plead guilty was actually and materially influenced by counsel's errors. See, Cepulonis v. Ponte, 699 F.2d 573, 577 (1st Cir. 1983); United States v. Garcia, 698 F.2d 31, 33 (1st Cir. 1983). One class of error that can actually and materially influence a defendant is counsel's Failure To Investigate. "[W]here the defendant enters a guilty plea, the issue of prejudice necessarily centers upon whether the attorney's failure to competently investigate any material facts prejudiced the defendant's ability to make an intelligent and voluntary plea of guilty." Dufresne, Id. at 23 (quoting Ford v Parratt, 638 F.2d 1115, 1118 (8th Cir. 1981), reversed and remanded on other grounds, 454 U.S. 934 (1981), on remand 673 F.2d 232 (8th Cir. 1982).

The waivers that accompany the entry of a guilty plea must be "an intentional relinquishment or abandonment of a known right or privilege," Johnson v. Zerbst, 304 U.S. 458, 464 (1938), and must be a waiver "with sufficient awareness of the relevant circumstances and likely consequences." Brady v. United States, 397 U.S. 742, 748 (1970)(cited in United States v. Taylor, 478 F.2d 689, 690 (1st Cir. 1973). Brady further explained that the requirement of an "intelligent and "voluntary" plea had been long recognized, and that Boykin added the requirement that the record affirmatively disclose that the defendant entered his plea "understandingly and voluntarily." Brady, 397 U.S. 748 n.4. See also, Parke v. Raley, 121 L.Ed. 2d 391 (1992).

As such, under the Constitution, a guilty plea is valid only
if it is "intelligent and voluntary" (Brady; Boykin), meaning "an
intentional relinquishment or abandonment of a known right or
privilege" (Zerbst), affirmatively disclosed in the record (Boykin).
If a guilty plea is not equally voluntary and knowing, it has been
obtained in violation of due process and is therefore void.
McCarthy v. United States, 394 U.S. 459, 466 (1969). The law
governing whether a plea is intelligent and voluntary is federal
law. Brewer v. Williams, 430 U.S. 387, 403-04 (1977)("The question
of an effective waiver of a federal constitutional right in a
proceeding is of course governed by federal standards."). A plea
must meet these numerous standards to be valid, and fails to do so
when the defendant either (1) does not "understand the nature of
the constitutional protections that he is waiving," or (2) "has
such an incomplete understanding of the charge that his plea
cannot stand as an intelligent admission of guilt." Henderson v.
Morgan, 426 U.S. 637, 645, n.13 (1976). "A valid guilty plea
also renders irrelevant - and thereby prevents the defendant from
appealing - the constitutionality of case-related government
conduct that takes place before the plea is entered. See, e.g.,
Haring v. Prosise, 462 U.S. 306 at 320 (1983)(holding a valid
guilty plea 'results in the defendant's loss of any meaningful
opportunity he might otherwise have had to challenge the admiss-
ibility of evidence obtained in violation of the Fourth Amend-
ment')." Class v. United States, 583 U.S. ___, 200 L.Ed. 2d 37, 45.

Furthermore, "a valid guilty plea relinquishes any claim that would contradict the 'admissions necessarily made upon entry of a voluntary plea of guilty.'" Class, Id. (quoting United States v. Broce, 488 U.S. 563, 573-74 (1989)).

Returning to Tollett, the primary "focus of federal habeas inquiry is the nature of the advice and voluntariness of the plea...[and the] prisoner must, of course, prove that some constitutional infirmity occurred in the proceedings...[and] must demonstrate that the advice was not 'within the range of competence demanded of attorneys in criminal cases.'" Tollett 411 U.S. at 266 (quoting McMann v. Richardson, 397 U.S. 759, 771 (1970)). Investigation and evaluation of evidence, facts, and circumstances are requirements for attorneys. "Counsel's failure to evaluate properly facts giving rise to constitutional claim, or his failure properly to inform himself of facts that would have shown the existence of a constitutional claim, might in particular fact situations meet this standard of proof ['competence demanded of attorneys in criminal cases']." Tollett, Id. (referencing McMann, Id.).

The requirement for attorneys to investigate and identify constitutional claims in order to render Sixth Amendment effective assistance of counsel, and subsequently to be properly informed so as to render constitutionally sufficient plea advice was recognized and reaffirmed by both the majority in Tollett (supra.)

<u>and</u> the Dissent (J. Marshall, J.Douglas, J. Brennan):

> "Faithful representation of the interest of his
> client...means, I believe, that an attorney must
> consult with the client fully on matters of con-
> stitutional magnitude.  Without such consultation,
> the representation of criminal defendants becomes
> only another method of manipulating persons in
> situations where their control over their lives
> is precisely what is at stake.  If plea bargaining
> is to be constitutionally acceptable, it must rest
> upon personal choices made by defendants informed
> about possible alternatives; at least, they should
> know what options are open to them.
>
> In this case, Henderson might have secured a sentence
> shorter than 99 years by **requiring the State to
> defend the constitutionality of its procedures**....
> As is clear from the record, such a defense could
> not have succeeded, and the embbassment of attemp-
> ting a defense might well have led the prosecution
> to offer a more favorable bargain."  <u>Id</u>. at 272-73.
> (emphasis added).

When the constitutionality of a State's actions or procedures
is in question, it is "within the range of competence demanded of
attorneys in criminal cases" (<u>McMann/Tollett</u>) only when such
matters of constitutional magnitude are duly challenged in the
adversarial process through investigation and analysis before any
advice to accept a plea agreement can be considered constitu-
tionally sufficient for a defense attorney to so advise.

A reviewing court is not permitted to assume that a plea
of guilty (even where defense counsel advice is constitutionally
sufficient) is "based on a defendant's determination that he would
be unable to prevail on a motion to suppress evidence." <u>Haring</u>,
462 U.S. at 318.  "A defendant's decision to plead guilty may have
any number of other motivations....[such as] apprehension and
charge, both threatening acts by the Government jar them....[or]

that a trial is not worth the agony and expense to the defendant
and his family." Id. (citing Brady, and Tollett, Id. at 263).

Lastly, Rule 11 of the Federal Rules of Criminal Procedure
"was intended to ensure that a defendant who pleads guilty does
so with an 'understanding of the nature of the charge and conse-
quences of his plea.'" United States v. Cotol-Crespo, 47 F.3d
1, 4 (1st Cir. 1995)(quoting McCarthy, 394 U.S. at 467).   There
are three key elements in a Rule 11 Plea Hearing - (1) absence of
coercion; (2) understanding of the charges; and (3) knowledge of
the consequences of the guilty plea.  Cotal-Crespo, Id. at 4
(citing United States v. Allard, 926 F.2d 1237, 1244 (1st Cir.
1991)).  At the time of the plea agreement, and the plea hearing,
Petitioner's entire knowledge base was provided by Counsel.
Petitioner avers that Counsel never informed Petitioner that by
pleading guilty he would be waiving all nonjurisdictional consti-
tutional claims arising from events occurring prior to the plea.
Petitioner avers that Counsel never informed Petitioner that by
waiving the indictment and pleading guilty in virtual tandem,
Petitioner was forgoing the opportunity to challenge the validity
and strength of the Prosecution's case via Objections to evidence,
objections to witnesses, impeachment opportunities against the
witnesses for the Prosecution, general Discovery under Rule 16,
and more specialized discovery under Brady/Kyles/Roviaro, etc.
(Couple the change of plea hearing with the arraignment, and
neither the Magistrate nor the Judge provided any of the above
information either.).  Counsel cannot provide a signed acknow-
ledgement from Petitioner confirming his knowledge of the

consequences of the plea, because no such information was imparted by Counsel to Petitioner, let alone memorialized in writing. And as to the understanding of the charges, that too was not clear to Petitioner. The understanding of the charges, like the consequences, were never informed to Petitioner by Counsel, nor is there any written evidence to the contrary.

As was the case for Petitioner as is for many defendants, the single instruction given by Counsel prior to any hearing is something to the effect of, "don't make the Judge angry, just say 'Yes, Your Honor' and keep things rolling". Indeed, this was the very sentiment and instructions given to Petitioner; and in a high-stress unfamiliar situation upon which his future is riding, "yes" was Petitioner's default response. (The terminology between parole and good time reductions did cause some difficulty, but all in all, Petitioner was following his Counsel's directions in answering 'yes' to all questions.

Had Petitioner known then, what he knows now, after pro se due diligence has taught him, he would not have pled guilty, nor would have waived the indictment. Petitioner's knowledge of the adversarial system, the repsonsibilities of Counsel, and the inner workings of the federal criminal system all began of his own account, post-sentencing, in the prison law library. Petitioner is thoroughly convinced that Counsel did not investigate, did not challenge the Prosecution's case, nor the constitutional admissibility of their evidence, nor the overlapping interaction

between State of Rhode Island officers with a warrant and SA
Richardson (acting without a warrant and ordering the 'continuence
of an ongoing criminal investigation non-standard search/seizure/
arrest of Petitioner in Dallas), matters of jurisdiction and venue
and evidence provenance (Texas and Rhode Island), confrontation
of accusers, impeachment of witnesses. Petitioner now has learned
that it is a common practice for federal Prosecutors to file
superseding indictments once a state-level prosecution has
commenced, which provides huge advantages to the Prosecution,
'cleans' the evidence from nearly all constitutional taint (after
all, it was the state officer who violated the constitution, and
not the federal officer), and probably also provides the federal
prosecutor with the boon of 'waivers in the state court by the
defendant due to non-objection' carrying on into the federal
proceedings. Considering all this, through a survey of numerous
federal cases by Petitioner, in context of the dearth of federal
cases that contain a waiver of indictment, and Petitioner is
absolutely convinced Counsel was ineffective in his case. The
irony is that someone like Petitioner, with no experience with
the criminal justice system must rely entirely on Counsel and
cannot call upon wily experience from previous arrests and cases.
Had Petitioner been more experienced as a defendant, perhaps he
would have been in a better position to identify Counsel's vast
shortcomings at the time, and taken steps then somehow to
obtain other counsel or make the court known of his dilemmas,
even if just to preserve his rights. Unable to identify the

failures of Counsel, Petitioner has had to discover and attempt to surpass every procedural bar (ultimately) put in his path by Counsel himself. The weaknesses of Counsel were capitalized on frequently by the Prosecution, and the 50/50 evenly fought advasarial process constitutionally guaranteed to Petitioner through the assistance of Counsel was closer to 80/20, with Petitoner at the disadvantage.

## Change of Plea Transcripts - a case in point

Preparation for the change of plea hearing was yet another failure by Counsel. Counsel never provided any rehersal or overview of the proceedings beforehand, nor any written materials. The first time Petitioner knew about the Prosecutions narrative was in Court. The quick verbal-only hearing, complete with instructions to answer 'yes' to the Judge did not bode well for Petitioner during the hearing, page 12 to 17. Reviewing the transcript, Petitioner cannot and does not agree with the duplicative elements p. 12, lines 24-25 through p. 13 lines 1-3. Later on p. 13, the description is far less than precise in describing how the third party alerts a state agency which leads to a federal agency. The use of "they" as to obtaining a search warrant p.13 lines 16-21 is false. It was a state ONLY warrant sought by a state office from a state judge, with no allowances for federal participation. As such, no federal agent, not even SA Richardson had "obtained a search warrant for the Defendant's house."

The lies continue. The search was on March 4, not "March 5th" as stated on lines 22-24. This is crucial in context to the later statements on p.14, lines 23 to p.15, line 3. In that later section, the Prosecutor provided the following:

```
23        "On March 6th of 2015, your Honor, the day after

24        the execution of the state search warrant, agent had

25        encountered the Defendant while he was coming back from
---------
1         international travel and seized an iPhone 6 from him at

2         a border search on that date."
```

The lies of omission in that single passage are misleading

to the Court and simultaneously highly prejudicial to Petitioner.

Line 23:    The date in question was March 5th.

            It was the same date as the execution of the warrant.

Line 24-:   SA Richardson, having illegally participated in the

            State of Rhode Island home search warrant without

            consent from the State Judge, contacted Border agents

            on his own volition and without any judicial oversight

            or authorization, and ordered those Dallas agents

            (located in the ND or TX, and not Dist of RI) to

            conduct a search of Petitioner, having pre-selected

            him to undergo a non-standard, non-random search

            outside of public view in a secluded private room,

            in furtherance of an ongoing federal criminal invest-

            igation.

Line 1:     The iPhone 6 was seized illegally, or under false

            pretense and was shipped by the Dallas officials

            to State of Rhode Island police (Not federal officials).

    The speed at which these words were spoken, combined with

not being warned that such a summary would be offered by the

Prosecution caught Petitioner entirely off guard, and when com-
bined with the "just say yes...don't make the judge angry"
instructions from Counsel, Petitioner did not speak up, and
thought possibly that Counsel would say something in rebuttal
to correct the factual errors and to fill-in the omissions.

The search and tlephone call by Richardson to Dallas and
their actions all on one day and very nearly simultaneously,
all without a valid federal warrant must have caused terrible
problems ot concerns for the Prosecutor(s) (State? and Federal),
respective to constitutional and procedural illegalities that
were too intertwined to be separated and still have a pro-
secutable case.  And so the federal Prosecutor, seeing that
obtaining an indictment would more than likely require the State's
Attorney first commencing with a Rhode Island prosecution to 'cure'
the federal prosecution of its ills, played the waiting game to
their advantage, their _clear_ advantage, relying upon the passive
non-adversarial conduct of Counsel, and possibly also banking on
the Magistrate to not peer too closely at their motions and
maneuvers.  Glossing over and changing details (under oath) at
the Change of Plea hearing was merely a final underhanded and
villainous ploy to seal Petitioner's fate, knowing that there
was plenty of plausible deniability to go around, and after all,
the AEDPA restrictions of one year will make uncovering all of
this a near impossible task.  Prosecutors and Counsel should
not embody such hubris.

## Ineffective Assistance of Counse Prejudice
## Continues to Prejudice Petitioner in his §2255

Petitioner is prejudiced in his §2255 as an extension of the original prejudice suffered due to the ineffective assistance of Counsel. Pettioner is at a loss to describe exactly what different strategies would be employed, namely because in the original procedings no strategies were employed at all. An alternative can only exits in contrast to a first object or action. From Petitioner's first-hand experience of the arrest and search/seizure events, he contends that a valid claim under Miranda v Arizona, 384 U.S. 436 (1966) could be presented regarding the Texas airport stop.

## The Dallas Airport Stop

On return from a US Navy intelligence deployment in the South China Sea, Petitioner flew back to the United States from Okinawa to Tokyo to Dallas Texas, on his way to New York where his personal vehicle was stored for the return drive to Rhode Island.

SA Richardson, according to his Affidavit, had arranged with CBP to have Petitioner stopped, [continue to next page]

—————————

(continue to next page)

seized/searched not on a routine border search, but as a direct
result of a "red flag" or alert placed on him by the Federal
Prosecutor.  Petitioner was removed to a place out of public
sight and generally not open to the public where Petitioner was
interrogated and had his cellphone/smartphone seized and searched
outside his presence.  A person is seized in constitutional
terms when a law enforcement officer "by means of physical force
or show of authority, has in some way restrained the liberty
of a citizen: so that he is not free "to walk away." Terry v.
Ohio, 392 U.S. 1, 16, n.16 (1968).  The Supreme Court elabor-
ated in United States v. Mendenhall, 446 U.S. 544, 554 (1980),
by stating a person is seized for purposes of the Fourth Amend-
ment "only if, inview of all the circumstances surrounding the
incident, a reasonable person would have believed that he was
not free to leave."  The First Circuit has found that an airport
stop where there was a prolonged interrogation was a seizure for
Fourth Amendment purposes.  United States v. Berryman, 717 F.2d
651, 656 (1st Cir. 1983).  A seizure of property, herein the
cellphone/smartphone, occurs when there is some meaningful inter-
ference with an individual's possessory interest in that property.
See, United States v. Jacobsen, 466 U.S. 109, 104 S.Ct. 1652,
1656, n.5 (1984).  These benchmarks are all found within Peti-
tioner's Texas airport stop.  Furthermore, it is well settled
law that if there has been an illegal search and seizure, any
statements derived therefrom are the "fruit" of the illegality
and are thus inadmissible.  Wong Sun v. United States, 371 U.S.

471, 485-87 (1963). Not only must the _Miranda_ warning be read to make any statements admissible (_United States v Porter_, 764 F.2d 1, 6-7 (1st Circuit 1985), all other portions of the search and seizure must comport with the law in order to establish that the statements made by a defendant were voluntary. This requirement emerges from the right against self-incrimination and the standards of due process of law. The relevant standard: voluntariness means that the statement was a product of a rational intellect and free will. _Blackburn v Alabama_, 361 U.S. 199 (1960). To determine wheather a statement is voluntary, the Court will examine the totality of the circumstances under which the statements were given by a defendant. _Mincey v Arizona_, 437 U.S. 385 (1978); _Schneckloth v Bustamonte_, 412 U.S. 218 (1973).

In the particular circumstances in which Petitioner found himself in Dallas on March 4, 2015, Petitioner was taken into custody and interrogated in absence of a _Miranda_ warning, thereby violating the 5th Amendment.

Respondent cites _US v Ramsey_, 431 U.S. 606, 616 (1977) and _US v Montoya de Hernandez_, 473 U.S. 531 (1985) as "the law of border searches". That characterization is partial, at best. Those cases refer to routine border searches and seizures. Petitioner was not subject to a routine border search. SA Richardson's affadavit clearly cites his decision to contact CBP at Dallas to request/order a search and seizure of Petitioner and his property. Dallas CBP complied with this demand and did so without a warrant for any and all components of the stop, search and seizure.

In the 1st Circuit, non-routine border searches are examined in US v Molina-Gomez, 781, F.3d 13, 23 (1st Circuit 2015) (hereafter Molina). The court discussed the status of the border relative to the constitution. It found that Miranda rules "at the border are more relaxed....Relaxed rules, however, do not mean no rules".

Miranda is a two pronged test. It requires custody and interrogation. In Molina the court found both, culminating in a violation of the 5th Amendment. Comparative analysis will show that the totality of the circumstances in Molina mirror Petitioner's experience in Dallas.

On the question of custody, Molina (and Petitioner) "was placed in a small windowless room"; he was "held in this room for between one and a half to two hours"; and the questioning to which he was subject went beyond "whether or not to admit Molina into the country". The court concluded "given the totality of the circumstances Molina was, indeed, in custody".

On the question of interrogation, the court found that the questioning of Molina was interrogation, quoting US v Long Tong Kiam, 432 F.3d 524 (3rd Circuit 2006) at 529, "interrogation begins once 'the inspectors questions objectively cease to have a bearing on the grounds for admissibility and instead only further a potential criminal prosecution'....The question regarding Molina's drug trafficing activities, therefore, constituted interrogation". This too was Petitioners experience in Dallas.

Because Molina (and Petitioner) was in custody and the questioning constituted interrogation "the CBP officers were required to give

Molina his <u>Miranda</u> warning.... Their failure to do so constituted a Fifth Amendment violation".

Petitioner was in custody and the questioning of Petitioner likewise strayed far beyond grounds for admissibility to the country, to include questions regarding the transport of national security classified material, Petitioner's professional activites for the US Navy in Asia, as well as extensive questions about Petitioner's private life and relationship with his fiance. SA Richardson's affadavit clearly states that he ordered the Dallas stop in furtherance of a domestic criminal investigation. As such, all law enforcement and prosecution after that incident knew, or should have known, of the constitutional/<u>Miranda</u> implications and violations of the events in Dallas. The custody and interrogation of Petitioner at Dallas mirrored Molina's experience and therefore **also** "constituted a Fifth Amendment violation".

It follows that if the custody in Dallas "was akin to 'a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest'" (<u>Molina</u>, quoting <u>Fernandez-Ventura I</u>, 85 F.3d 708, 710 (1st Circuit 1996); quoting <u>Thompson v Keohane</u>, 516 U.S. 99 112, 116 S.Ct. 457, 133 L.Ed 2d 383 (1995)), then the seizure of Petitioner's cell phone incident to arrest invokes <u>Riley v California</u>, 573, U.S. ___, 134 S.Ct 2473, 189 L.Ed 2d 430, (which in turn affirms <u>US v Wurie,</u> 728 F.3d 1, (1st Circuit 2013), where the United States Surpeme Court found that the "answer to the question of what police must do before searching a cell phone seized incident to arrest is accordingly simple - get a warrant".

The subsequent issuing of a warrant more than six weeks later, in the District of Rhode Island (not the Northern District of Texas) under a different case number (there were as many as three case numbers used at various times in Petitioner's criminal case); does not cure the violation of <u>Riley</u> in Texas six weeks prior.

That action merely merely deomonstrates a desperate attempt by SA Richardson and/or Respondent to conceal (or alternatively, to establish post hoc curative justification for) investigative activities that are violative of the Constitution.

--------------------------

(continued on next page)

The Supreme Court's ruling in the above case was one to affirm the decision of the First Circuit, who had decided the matter nearly identically. <u>United States v. Wurie</u>, 728 F.3d 1 (1st Cir. 2013). In the ruling, the First Circuit stated that in the context of the search-incident-to-arrest exception, at the touch of a button a cellphone search becomes a 'house search', and that is not a search of a "container" in any normal sense of that word, though a house contains data. Although not pronounced as one, the Texas airport stop was

an investigatory interrogation from which he did not feel free to leave, in a portion of the airport not open to the general public, in offices operated or controlled by the Federal law enforcement agencies, where during the course of the interrogation Petitioner's cellphone/smartphone was taken from his presence for additional search and seizure of the device and its data (above and beyond the search/seizure of Petitioner's person), and through the separation from his property, his perceived freedom to leave was all but extinguished.

## Search of the Rhode Island Home

As explained previously, the search of the Petitioner's Rhode Island residence occurred at nearly the same time as the Texas airport events. To the best of Petitioner's understanding, the search warrant, search warrant affidavit, and the actual conduct of law enforcement could be scrutinized. The attack point for this event is the question of whether it was a state or federal warrant, whether the actual search was conducted by

Rhode Island law enforcement, Federal law enforcement, or a combination of the two. This raises further issues to challenge regarding under whose magistrate's authority was the search authorized, and in either case, what legal provisions were taken or secured to permit the legal participation of a warrant of one jurisdictional sovereign by officers of both that same sovereign and officers of another sovereign authority. In other words, were Rhode Island and Federal authorities conducting the search under the color of Rhode Island law through a Rhode Island search warrant, or were Rhode Island and Federal authorities conducting the search under the color of Federal law? With only a limited amount of documents on these specifics, Petitioner posits that it was an investigation begun[1] (for search purposes at the Rhode Island residence) by the Federal authorities who persuaded members of the Rhode Island law enforcement to seek a Rhode Island search warrant[2] and during the "state" search, a few "Federal" authorities will be present. If any problems were to arise with the validity of the search and the subsequent admissibiilty of the items seized, those illegalities would officially rest squarely upon the Rhode Island authorities exclusively. However, those authorities in the mean time, would have presented to the federal authorities the state authorities' seized items (who would vouch for their admissibility, albeit only a temporary admissibility). At that moment, the Federal authorities could state that they received the items in good faith from Rhode Island, and claim no knowledge of any problems

1. in January 2015
2. in March 2015

- 43 -

or illegalities with the principal search, partially because the Federal authorities were never offical participants. (This despite the likelihood that some of the Rhode Island law enforcement at the search have some form of quasi-formal attachment to the Federal government Department of Justice via a joint task force venture or temporary deputization.). Although this technique provides a disguise, the clean hands of the Federal authorities through non-particiaption in the search, are dirtied by extension, and therefore unable to receive the evidence offered up on a 'silver platter'. See, Elkins v. United States, 364 U.S. 206, 208 (1960)(illegal evidence gathered in violation of the Fourth Amendment by state officers cannot be used against a defendant in Federal court). And in those incidents where the machinations of either the state, Federal, or both authorities transgress the Fifth Amendment in such endeavors, see, Bram v. United States, 168 U.S. 532, 548 (1897)(evidence obtained through Fifth Amendment violations is excluded in Federal court). In any event, Petitioner would exercise his rights to seek an Evidentiary Hearing, as provided by Franks v. Delaware, 438 U.S. 154, 155-56 (1978) in order to challenge the sufficiency of the search warrant and its underlying affidavit submitted to obtain the authorization to conduct the search and seizure.[2]

SA Richardson's affidavit states that he participated in the search of the home under the RI State search warrant.[1] This is simply impermissable. SA Richardson should have got a federal warrant and he did not. Back in 1927, the Supreme Court of the

---

1  March 4, 2015
2  Continuing with the types of challenges Petitoner could make

based upon the underveloped nature of the original procedings,
if the warrant were truly originating from Rhode Island, Petit-
ioner's challenge would be to use not only the Franks hearing,
but to examine the state search warrant for compliance with the
General Laws of Rhode Island, with respect to probable cause,
statutes cited, affidavits, and procedures of search and seizure:

Title 12-Ch. 5 <u>Search Warrants</u>, §12-5-1 Authority to Issue;
§12-5-2 Grounds for issuance; §12-5-3 Issuance and Contents;
§12-5-7 Disposition of seized property; §12-5-8 Hearing upon
seizure of matter alleged to be obscene; §12-5-10 Electronic
communication services;
Ch 5.1 Interception of Wire and Oral Communications; Chapter 6
Warrants for Arrest; Chapter 7 Arrest; Chapter 11 Country Grand
Juries; Chapter 11.1 Statewide Grand Juries; Chapter 12 Indictments,
Informations and Complaints. Furthermore, examination of General
Laws, Title 11 Criminal Offenses would be emploed to challenge
the actions of and allegations by Rhode Island authorities.

(continued on next page)

United States held that "the participation of the [federal] agent in the [state] search was under the color of his federal office and that the search in substance and effect was a joint operation of the local and federal officers. In that view.... the effect is the same as though he had engaged in the undertaking as one exclusively his own". Byars v US, 273 U.S. 28, 33, 47 S.Ct 248, 250, 71 L.Ed 520, cited in McGinnis v US, 227 F.2d 598 (1st Circuit 1955). McGinnis cites Johnson v US, 333 U.S. 10, 68 S.Ct 367, 92 L.Ed. 436, in explaining the absence of exceptional or exigent circumstances as defeating the only valid argument federal law enforcement might advance for not having gone to the trouble of getting a search warrant. We have come a long way from 1927. Federal agents now secure valid search warrants by phone, email, instant messaging; they are no longer required to physically appear before a Magistrate.

The only valid warrant on March 4, 2015, was a RI State Warrant that made no provision for federal officer participation, and when coupled with no federal warrant, SA Richardson's participation was illegal. Classifying SA Richardson's participation as simple error is implausible. It demonstrates a pattern of gamesmanship that conforms to Petitioner's assertion that SA Richardson and the prosecution were using RI State authorities to provide evidence obtained with 'clean hands'. There were certainly no exigent circumstances attenduating the RI State search. Its quite simple, SA Richardson should have got a warrant. That he did not is striking and in fact a clear violation of the Constitution.

McGinnis held that "a federal agent cannot particpate in an un-
lawful search, and then on the basis of what he observed in the course
of that search, and on that basis alone, go to a United States Comm-
issoner and swear out a search warrant. Such a search warrant, and the
evidence procured in the course of a search thereunder, would be merely
the illegal product of a previous unlawful search by the federal auth-
orities. See Silverthorne Lumber Co., Inc. v US, 251 U.S. 385, 40 S.Ct.
182, 64 L.Ed 319". (The essence of a provision forbidding the acquisit-
ion of evidence so acquired shall not be used before the Court but that
it shall not be used at all).

Yet this is exactly what SA Richardson did. He used RI State evi-
dence obtained during an illegal search (due to his presence), as
grounds to later seek a federal search and arrest warrant of Petitioner.
Silverthorne (1920) and McGinnis (1955) unambigiously hold that such
actions are illegal.

Moreover, the prosecution would have known that this conduct was
illegal; because they are required to know this per Kyles v Whitely,
514 U.S. 419, 438 (1995). This is for numerous purposes: (1) They
need to know the validity of their own case; (2) They need to know
the strength of their own case, (a) admissible/inadmissable  evidence
and procedures; (3) They must have this data/documentary evidence
readily avaiable to defense counsel per Brady/Kyles. "The individual
prosecutor has a duty to learn of any favorable evidence known to
the others acting on the government's behalf in the case, including
the police" Kyles. Effective defense counsel know this and would
advise clients to take advantage of post indictment curative meas-
ures. This did not happen in Petitioner's criminal case.

Defense Counsel Flanagan informed Petitioner that AUSA Donnelly would reveal his fiance's name and image to the press if he did not take the plea. Petitioner does not know if Flanagan was telling the truth, nor can he prove this allegation. Nevertheless, he wants to put it on the record as his sworn testimony, if for no other reason than others might be forewarned of the types of behavior that can be expected from the United States Attorney for the District of Rhode Island and/or Attorney Flanagan. The threat of exposing his family to the media was credible to Petitioner because the prosecution made sure that a reporter was present for his initial appearance in court. A number of extremely damaging stories resulted in the British and Australian press, all before any evidence was presented to the Court. The Head of State in Australia was implicated in one of these stories due to a prior professional relationship with Petitioner. This was excruciatingly humiliating and intentionally so. The fact that it was done on the back of illegal evidence and a series of constitutional violations makes that behavior the more reprehensible and prejudical.

As has been shown throughout the cost of an ineffective counsel has been great, when coupled with a prosecution willing to do anything to win. Defense counsel engaged by Petitioner were not only incurious but they singularly failed to know the law. More importantly they failed in their duty to their client, according to John Henry Wigmore's introduction to Albert S Osborne's The Problem of Proof (1922)

There is no other relationship in human affairs exactly analogous to that of attorney and client. It is a relation that in its intimacy and responsibility is an example of surpeme trust and confidence. By it we ask another for the time and occasion to be ourselves. It is as if for the time being we transfer our individuality to another who then becomes our mind, our voice and even in a degree, our conscience. It is not strange that this relation from the earliest times has been most closely guarded, and that there are inseparably connected with it certain rules of honor which to disregard put the brand of infamy upon the transgressor. To violate this sacred trust [of advocacy] and be disloyal to a client is deservedly the unpardonable sin of an attorney. By this betrayal he sinks lower than by any other act of dishonor.

Defense counsel in this case were not overworked and under resourced public defenders. They were private criminal defense attorney's in a state with comparatively few cases per year. Had they or their family or friends been subjected to the activities of Attorney Donnelly and SA Richardson, they would have likely, one hopes, endevored to effectively represent those close to them. They would have bothered to investigate the facts and the law pertinent to the case and acted to prevent serious and glaring violations of the constitution from proceding in Court. That they did nothing in this case is, as Wigmore so eloquently puts it "the unpardonable sin of an attorney".

GROUND TWO - Prosecutorial Misconduct

Within the First Circuit, preserved claims of prosecutorial misconduct are reviewed de novo. See, United States v. Ayala-Garcia, 574 F.3d 5, 16 (1st Cir. 2009). When there is no preservation or contemporaneous objection in the original proceedings, the review is for plain error.. See, United States v. Sanchez-Berrios, 424 F.3d 65, 73 (1st Cir. 2005). To establish plain error, the Petitioner must establish "(1) that an error occured (2) which was clear or obvious and which not only (3) affected [his] substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001). Petitioner avers that any and all forfeitures or failures to make an objection are the direct result of the Sixth Amendment violation of his Right to Effective Assistance of Counsel, and was made upon the unreasonable conduct and advice of Counsel. See also, Fed.R.Crim.P. Rule 52(b), "A plain error that affects substantial rights may be considered even though it was not brought to the court's attention." Also, Johnson v. United States, 520 U.S. 461, 465 (1997)(failure to assert right usually results in forfeiture, but plain error rule mitigates); e.g., United States v. Earle, 488 F.3d 537, 548-49 (1st Cir. 2007).

Due to the lengthy, yet procedurally undeveloped nature of Petitioner's criminal case, should Petitioner's claims appear plausible, but wanting for evidentiary support, Petitioner prays the Court order Discovery and Expansion of the Record,

To the extent as needed, Petitioner prays the Honorable Court apply the ineffectiveness of counsel and any forfeitures arising therefrom as mitigation to overcome any subsequent procedural default. As Massaro provides for Ineffective Assistance Claims to be immune from procedural fault, actions arising from the Ineffective Assistance in Petitioner's case can also excuse a procedural default in keeping with the two-prong Strickland analysis. Turner v. United States, 699 F.3d 578, 584 (1st Cir. 2012)(citing Strickland, 466 U.S. at 688); Owens v. United States, 483 F.3d 48, 63 (1st Cir. 2007). In this case, the Ineffective Assistance claim(s) preserves Petitioner's rights concerning the Speedy Trial Act (United States v. Gonzalez-Arimont, 268 F.3d 8, 12 (1st. Cir 2001)(claims under the Speedy Trial Act are nonjurisdictional and waived with an unconditional gulty plea), as well as other claims of Prosecutorial Misconduct. See, Tse v. United States, 290 F.3d 462, 465 (1st Cir. 2002) (if the claim fails on the merits, the related claim that counsel rendered ineffective assistance in failing to press that parti-cular claim or issue also fails).

Search Warrants, Warrant Affidavits, Evidence, etc.

The principal discussion of the entire law enforcement and investigation process will be covered in detail in GROUND FOUR. Nevertheless, Prosecution has a duty to have knowledge of and access to all the evidence, exculpatory and otherwise, that is in their possession or that of law enforcement or agents who have worked on the case. Whereas the duty to fairly disclose same is found within the principles of case law, it is upon the Fourth

and Fifth Amendments as well as the standards of the Department of Justice that a Prosecutor commences and presses for an Indictment. The Brady line of cases began with Mooney v. Holohan, 294 U.S. 103 (1935) and Pyle v. Kansas, 317 U.S. 213 (1942). In Brady, the Supreme Court held that a state actor violates a criminal defendant's due process rights by the knowing use of perjured testimony or the deliberate suppression of evidence leading to the defendant's conviction. Brady v. Maryland, 373 U.S. 83, 86 (1963). Kyles v. Whitley, 514 U.S. 419, 432 (1995) held that the prosecutor's affirmative disclosure obligation also encompasses evidence known only to law enforcement officers and not to prosecutors (Id. at 437-38), stating that Brady "can trace its origins to early 20th century strictures against misrepresentation." (Id. at 432). The duty that these cases established has always applied equally to prosecutors and law enforcement officers. See, Haley v. City of Boston, 657 F.3d 39, 50 (1st Cir. 2011); Limone v. Condon, 372 F.3d 39, 47 (1st Cir. 2004). It is a violation of a defendant's Constitutional right to due process when a prosecutor fails to disclose material evidence in his possession that is favorable to the defendant, irrespective of the good or bad faith of the prosecutor. Brady, at 87. The First Circuit characterized that Brady is "sometimes referred to as imposing a no-fault disclosure obligation" on prosecutors. Haley, 657 F.3d at 48. With this context, Petitioner continues his Prosecutorial Misconduct claims.

## Failure to seek an Indictment against Petitioner

Petitioner posits that there are two distinct methods to interpret the Prosecutor's actions in this regard. (1) The Prosecutor was attempting to achieve an indictment in all earnestness, but was unable to achieve this goal due to the circumstances of the case that occurred prior to his involvement. (2) The Prosecutor operated in a 'shady, grey area', if you will, by not obtaining the indictment through use of evidence that he knew would never withstand the scrutiny of the Court, or the various Motions and forms of active defense that one would normally expect, post-indictment. These would include, motions to dismiss, acquittal, evidentiary challenges, witnesses subpoenaed, et al. Although the 'soft' attempt at Indictment may have been attempted (Grand Jury transcripts would provide illumination to this issue), the underlying motive is more icy and underhanded, namely, to stall the process by any means, hoping to wear down the resolve of the Defendant, who would break down to waive the indictment upon Counsel's advice, accept a plea agreement on Counsel's advice, waive his Appeal rights on Counsel's advice, and provide the Prosecution with a "win" - and presumably a "win" that would provide the procedural default disguise necessary to camoflage the suspect machinations of the U.S. Attorney's Office (at least long enough for the claims to remain hidden past the §2255 time period). It is well-established that the Officers of the Court must address and act towards the Court with candor. In this instance, the Prosecutor failed that ethical test, and could even be alleged to passively engineer a deception on the Court, at Petitioner's expense.

Applied to the above, if the prosecutor has a strong case that would likely win a trial, there is no reason to delay or sabotage their own  efforts at obtaining an indictment. But,

------

(continued on next page)

if their case suffers from admissible evidence problems, juris-
dictional problems, procedural problems, etc., it makes perfect
sense to continue delaying the proceedings in order to obtain
an indictment that, as experienced professional lawyers, the
Prosecution knew, or should have known would never be obtained.
And if _that_ is the case, then the Prosecution is 'gaming' the
system (perhaps with, or without the passive cooperation of
disinterested Defense Counsel) in order to apply glacier-like
pressure and pacing upon a defendant who has, due to the arrest
and the Prosecutor's publicity, had his livelihood and liberty
curtailed and perhaps forever affected (especially so in context
of Petitioner's career and service to the Department of Defense).

Another analysis is that Prosecution offended the Speedy
Trial Act by failing to adhere to the 30-day time frame for
producing an indictment after arrest. Can it be reasonable
that a statutory limitation of 30 days was sought to be extended
to over 250 days by the Prosecution without any apparent timerity
for their actions? (Compare to the Magistrate's Abuse of Dis-
cretion in Granting such a total length extension). The Defense
Counsel is responsible for making objection in such cases, unless
the Magistrate declares a dismissal sua sponte or through the
refusal to grant any further extensions. In either event, the
time was never requested for the ends of justice, nor was granted
in any such manner. Either Counsel was so ineffective as to
let Prosecutor's tactics go on unchallenged, or Prosecutor knew
of Counsel's ineffectiveness after the first granted extension

and sought to continue that line until hopefully they could somehow achieve an indictment, or that Petitioner would give in.

Although the record is insufficiently developed, given the conduct of Prosecution as above, Petitioner asserts that the Prosecution was either willfully blind to the Federal and Rhode Island officers' investigative, search, seizure, warrant, and affidavit shortcomings, or were simply "stuck" with a case that had no chance outside of a concession and plea by Petitioner. That, in effect, the case was so flawed by actions of law enforcement, that it was 'unwinnable' at trial, but given the culture of conviction that seems to exist in the criminal division of the Department of Justice, 'giving up' on a case as a Prosecutor in light of a nearly 98% conviction rate throughout the Federal system would be hard to 'live down' and in some circumstances such a failure as a prosecutor could severely and negatively change the career trajectory for a prosecutor. The irony is the trajectory for Petitioner's career which changed upon federal arrest and subsequent publicity and unsavory character assasinations by the Prosecutor.

The record needs to be examined for instances of what would have been Brady/Kyles type evidence in the possession of the prosecution or law enforcement, and used herein either to prove prosecutorial misconduct or as a benchmark for the ineffectiveness of counsel, and in either case, to test the actual admissibility of same. Lastly, Kyllo-type evidence used to trace or investigate could be discovered through discovery or examination.

## Overlap between Ineffective Assistance of Counsel and Prosecutorial Misconduct

It is hard to clearly draw a line between where ineffective assistance of counsel ends and prosecutorial misconduct begins, and vice versa. On the last page of the ineffective assistance of counsel section in this Memorandum (above), it was shown that defense counsel was ineffective, not only because of their failure to investigate but because of their faulty plea advice that prevented access to Kyles/Brady information held by the government.

In prosecutorial misconduct analysis below, it is important to reiterate that the prosecutions Kyles/Brady duty made it impossible for the prosecutor to be ignorant of SA Richardson's multiple violations of the constitution.

Below we explore this problem further, and show that by the government's actions, the criteria for misconduct, resulting in prejudice to Petitioner are supported by the facts. Indeed, it will be shown that what occured was not an accident but a bad faith prosecutorial strategy that resulted in a due process violation of the constitution.

Finally, attention is drawn to the standards of ethical conduct for both the prosecution and defense counsel and it is shown that individually and cumulatively both failed the Court.

Brady has been more recently explained in Banks v Dretke, 540
U.S. 668, 691, 124 S.Ct. 1256, 157 L.Ed 2d 1166 (2004) (quoting
Strickler v Greene, 527 U.S. 263, 281-82, 119 S.Ct 1936, 144 L.Ed.
286 (1999) "the three components or essential elements of a Brady
prosecutorial misconduct claim [are]: 'The evidence at issue must
be favorable to the accused, either because it is exculpatory or
because it is impeaching; that evidence must have been suppressed by
the State, either wilfully or inadvertantly; and prejudice must
have ensued".

The standard of prejudice is not whether there would have been
a different verdict under the withheld evidence but "whether in its
absence he received a fair trial, understood as a trial resulting
in a verdict worthy of confidence" (Strickler quoting Kyles). Is
there any doubt that had the violations of the 4th 5th and 6th
Amendments perpetrated by SA Richardson at the home and under his
aegis at Dallas, had come to light, through disclosure by the
prosecution to defense counsel (or through defense counsel investi-
gation) "the favourable evidence could reasonably be taken to put
the whole case in such a different light as to undermine confidence
in the verdict" (Kyles)? In this instance the plea agreement, once
accepted, becomes the verdict.

The prosecutor has said on the record in this litigation that
he could have taken the case to a Grand Jury and gained an indictment.
But we now know, through his disclosures, that he never did. He asked
the Court for 8 extensions of time to form a Grand Jury but he evid-

edentially decided not to attempt to gain an indictment. That is so unorthadox that it points to a deception on the Court about which defense counsel was too incurious to investigate. Absent indictment, defense counsel has no procedural way to challenge the prosecution's case. Defense counsel advised Petitioner that he was a great attorney for holding off indictment. Instead, he advised to waive indictment and take a guilty plea. The plea agreement could have been entertained post indictment. Without the indictment, no challenge to warrants, arrest, the search of the home, the stop at Dallas, the admissibility of evidence, Rule 16/Brady/Kyles materials were possible. With the indictment, all of that would be provided by the prosecution to defense counsel. A plea agreement entered into after a full and fair survey of the above materials would have made the requisite adversarial challenge a reality, and furthermore, would have [coupled with independant investigation] made any plea agreement acceptance knowing and willing.

There is a double fault here. The prosecution enaged in a deception of the Court to gain a tactical advantage (US v Marion, 404 U.S. 307, 30 L Ed 2d 468, 92 S. Ct. 455 (1971, at 324) "in reckless disregard of circumstances, known to the prosecution" (US v Lovasco, 431 U.S. 783, 791, 52 L.Ed. 2d 752, 97 S.Ct. 2044 (1977)) resulting in a due process violation.

The United States Attorney represents all of the people of the United States "including those who may stand before the

court accused of criminal activity" (US v Kelly, 543 F.Supp 1303 1982 US Dist Lexus 13814 No. CR 80-316-T). They have a unique role in the criminal justice system best articulated by Berger v US, 295 U.S. 78,88, 55 S.Ct 629, 633, 79 L.Ed.1314 (1935):

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereginty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest therefore, in a criminal prosecution is not that it shall win a case, but that justice be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

While AUSA Donnelly may hide behind his obligations as described above because a plea agreement freed him of the necessity to share critically important evidence with an epically incurious defense counsel, his role in engaging in delay to gain a tactical advantage is a classic example of acting in bad faith (US v Ciampaglia, 628 F.2d 632, 639 (1st Circuit), cert. denied, 449 U.S. 956 (1982). Moreover, his duty to refrain from improper methods, such as the striking of foul blows (see above), are not contingent on the status of plea agrements: these are broad duties. The ethical standards of the American Bar Association (ABA) are also clear in this matter. "Knowing use [of] false evidence... would be patently antithetical to the standards required by the Department of Justice" quoted in US v Kelly (Supra). AUSA Donnelly made a conscious decision to win at all costs and in so doing failed the Berger standard.

## GROUND THREE - JUDICIAL ERROR

Ground Three seeks to establish that the actions of Magistrate SULLIVAN and/or Judge MCCONNELL contained incidents of Abuse of Discretion, Plain Error, or were the result of Officers of the Court dealing with them with less than the expected candor due the Judiciary.

Magistrate SULLIVAN absed her discretion when she approved a total of Eight (8) Extensions of Time to Indict in Petitioner's case. As shown in the Docket and Statement of Relevant Facts, ranged from April of 2015 to January of 2016, and permitted the Prosecution the opportunity to obtain an indictment for over nine (9) months.

It also should be noted that nowhere in the Docket does Magistrate SULLIVAN make any allowances or references to "excludable time" for the extensions, respective to Petitioner's Speedy Trial rights, Constitutional and Statutory.

Magistrate SULLIVAN committed Plain Error (alternatively Abuse of Discretion) in authorizing the federal search and seizure warrants for HSI RICHARDSON, without close scrutinization of the nature and circumstances (lack of authorization from RI Judge) of RICHARDSON's participation and possible orchestration of the RI search of Petitioner's residence. The Magistrate also failed to recognize that the material in RICHARDSON's application and affidavit contained data and information that was obtained (illegally) under a presumed inevitable discovery, that in fact, existed well outside the scope and purpose of the RI search warrant and investigation originating with TUMBLR.

## Speedy Trial significance of the Magistrate's conduct

The Magistrate's repeated actions GRANTING the Prosecution's Motions for Extension of Time to Indict run afoul of the Speedy Trial Act. Alternatively, if the Court views the matter as one of Ineffective Assistance or Prosecutorial Misconduct, or some combination, Petitioner's facts remain as evidence of entitlement to relief.

The text of the sanction provision for speedy indictment claims (18 U.S.C. §3162(a)(1)) does not explicitly require a defendant to file a motion to dismiss the charges. (In comparison, the sanction for speedy trial, per se, does require motion from defendant.). The Speedy Trial act §§3161-3174, imposes a thirty day limit on the time between arrest and the filing of an indictment or an information. The purpose of the 30-day-arrest-to indictment requirement is to ensure that a defendant is not held under an arrest for an excessive period of time without receiving formal notice of the charge against him to which he must prepare himself to defend. United States v. Meade, 110 F.3d 190, 200 (1st Cir. 1997). See also, Zedner v. United States, 164 L.Ed. 2d 749 (2006). "§3162(a)(2) assigns the role of spotting violations of the Act to defendants...and by requiring that a defendant move before the trial starts or a guilty plea is entered it...limits the effects of a dismissal without prejudice." Zedner, as quoted in United States v. Spagnuolo, 469 F.3d 39, at 45 (2006). Should the Honorable Court follow the reasoning in Spagnuolo, the ineffective assistance of Counsel

claim is to be applied, in that Counsel failed to make the
necessary objections and motions respective to §3162(a)(1),
and furthermore failed to notify Petitioner that such an
argument or strategy was available.

Lastly, Petitioner argues that the Magistrate had a duty
to recognize the jurisdictional/evidentiary defects in the
Prosecution's case, perhaps on their face, or perhaps in light
of the repeated failures by Prosecution to obtain an indictment
and subsequent requests for more time, all of which at Peti-
tioner's disadvantage, implicating his Constitutional right
to a Speedy Trial as well as the Speedy Trial Act. By failing
to recognize the dilatory tactics of Prosecution, the Magistrate
promoted their unsavory tactics. A dual claim may also be that
Counsel was ineffective for not invoking Speedy Trial act
provisions regarding the lack of indictment, while simultane-
ously Magistrate SULLIVAN committed an Abuse of Discretion that
ultimately prejudiced cumulatively (with the actions/failures
of Counsel) to lead Petitioner into the acceptance of the
Information and Indictment waiver, feeling that the process
in American Federal cases is a type of war of attrition to be
prolonged indefinitely, like siege warfare, to wear down the
opponent's resolve.

Petitioner requests the Honorable Court conduct a careful analysis of the entirety of Docket #3, with specific reference to the assertions of HSI RICHARDSON, and the comparison between the search warrant affidavits between RICHARDSON and RI State Officer MORSE and others. At no. 7 of RICHARSON's Probable Cause, he states "I have been investigating this case along with other members of the Rhode Island Internet Crimes Against Children Task Force..." He insinuates that he had prior authorization to conduct this investigation, insinuates that he had judicial authorization to participate in the RI search warrant execution, and further insinuates that he is a member of a STATE (not federal) organization. He offers no evidence of his authority to participate in state investigations or searches. In fact, according to the first three sections of the Affidavit, he clearly and plainly states that he is a federal officer with Homeland Security Investigations, but makes no mention of his ability to act in any State-level capacity or under anything other than color of federal law. Later in the affidavit, RICHARDSON states that RI forensic analysist MORGAN provided him with data and information outside the scope and original purpose of the RI search and seizure, making any of the data he cited as fruit of the poisonous tree, due to his unauthorized participation in the RI search. Still further in the affidavits, RICHARDSON stated

that he, RICHARDSON ordered the specialized (non-routine) border stop of Petitioner in the Texas airport, and that RICHARDSON also also ordered the seizure of Petitioner's iPhone.  It was only after the fact, including the handling of the phone by Texas federal officers, mailing to RICHARDSON, and delivery to the RI authorities (who at the time had the ONLY valid warrant of any kind for Petitioner's property), that RICHARDSON eventually makes his belated request for post hoc seizure and the (allegedly yet-to-be-done) search of Petitioner's illegally seized iPhone. As stated earlier, Petitioner did not feel free to leave, and he presented his property to the officers under a wrongful pretense by them, unaware of their lack of authority to seize his property and being unaware that the order came from an HSI agent and not a judge or magistrate.

Due to the undeveloped nature of Petitioner's case, Petitioner prays the Court grant his contemporaneous request for discovery, for Petitioner to further support his claims that exist in limited form already in the relatively small record in this case.

## Constitutional and/or Statutory Speedy Trial Violations

The assignment of error in Petitioner's case respective to Speedy Trial/Speedy Indictment issues is not neatly placed on the shoulders of Counsel, nor Prosecutor, nor Magistrate as the single actor causing the violation(s). The percentage of error, whether intended or not, is distributed between them.

Principally, passive defense counsel was combined with consciously zealous prosecution in presenting the Magistrate with _increasingly_ invalid premises for Extensions of Time to obtain an indictment in a case woefully mired in 'post-arrest non-indictment' limbo. To what extent the motions from the Prosecution lacked the requisite candor and honesty to the Magistrate - assented to by Counsel - and what extent the Magistrate (or the Magistrate's clerks) failed to exercise due diligence requires investigation and examination by the Court in these proceedings.[1]

To begin, the responsibility in these matters lies originally with the Prosecution in order to Constitutionally/Statutorially prosecute their case, otherwise no legal conviction could be had. Compliance is critical for the viability of cases and convictions. In the second analysis, the Prosecution owes the Court Speedy Trial notifications as well. "Even though a prosecutor does not bear the burden of monitoring the court's compliance with the [Speedy Trial Act] in absence of an announced rule, district courts do look to prosecutors for assistance as officers of the court." United States v. Ramirez, 973 F.2d 36, 39 (1st. Cir. 1992). As Petitioner's case occurred more than 20 years after

---

1  sua sponte in camera, or Evidentiary Hearing

Ramirez, it can be said that Prosecutor Donnelly should have known of this Circuit's position on the matter. In Petitioner's case, Counsel also failed to monitor the Spedy Trial ramifications, because §3161 and §3162 require a "motion of the defendant" to dismiss an indictment.

Two possible starting dates for consideration:

The **first argument** will be **March 4, 2015** as the operative date for calculation. The rationale is that the Dallas airport stop was an arrest for purposes of Fourth and Fifth Amendment claims elsewhere in this Memorandum. The stop was not routine, and was in furtherance of an ongoing (presently going) criminal investigation, involved removal of Petitioner to a non-public area where he did not feel free to leave, and furthermore resulted in the seizure of Petitioner's property. Whether legal or illegal, it was an arrest under the Constitutional definitions of arrest. Per March 4, 2015 as the operative date, Petitioner was not indicted (nor signed waiver of indictment) within the non-excludable days limitation of 30 days. Dismissal is warranted.

The viability of the Dallas stop arguments provide <u>not only</u> the grounds for Vacation of Conviction, but when applied in the Speedy Trial/Indictment analysis, provide more than vacation, they provide grounds for a mandated <u>dismissal</u> of charges. <u>Strunk v. United States</u>, 412 U.S. 434, 440 (1973).

The **second argument** will be **April 3, 2015** as the operative date for calculation. This date was when Petitioner was taken into

custody in Rhode Island. The problem for the Prosecution that arises from this interpretation is that it directly implicates the Dallas stop, interrogation, and seizure as being entirely unconstitutional, therefore, impermissable and inadmissible - if the Prosecutor's current position is that April 3, 2015 was the first and only arrest.

The Dallas events notwithstanding, the April 3, 2015 date (and the March 4, 2015) date require an analysis to determine if the "mandate[d]...exclusion of certain periods of delay" apply. United States v. Salimonu, 182 F.3d 63, 67 (1st Cir. 1999). The Circuit advised that "we must start from scratch in the computation of excludable and nonexcludable time under the Act." United States v. Pringle, 751 F.2d 419, 429 (1st Cir. 1984). "First, we must 'do the basic mathematics and determine the aggregate time elapsed awaiting [indictment].' United States v. Staula, 80 F.3d 596, 600 (1st Cir. 1996). Second, we then ascertain how many days should be excluded from the total time." United States v. Barnes, 159 F.3d 4, 10 (1st Cir. 1998)(quoting Staula). "Failure to file within the thirty-day period requires that the complaint shall be dropped or otherwise dismissed unless the time limit under §3161(b) has been extended by §3161(h)." United States v. Mitchell, 723 F.2d 1040, 2042 (1st Cir. 1983). Section 3161(h)(8)(A) states that when continuence is granted, "no such period of delay resulting from a continuance granted by the court in accordance with this paragraph shall be excludable under this

subsection unless the court sets forth, in the record of the case, either orally or in writing, its reasons for finding that the ends of justice served by the granting of such a continuence outweigh the best interest of the public and defendant in a speedy trial." Id. Repeated motions from the Prosecutor were submitted to exclude days to indict, under the guise of the 'ends of justice' being served, and said motions were repeatedly granted by the Magistrate. The Docket clearly states that the Extentions of Time were granted for "Time to Indict". As revealed earlier in this litigation, the Prosecutor never obtained an indictment, and moreover, never sought to indict Petitioner. It has been advanced that the days were required to work towards a plea agreement; however, it was a plea agreement that was only offered after Petitioner agreed to waive an indictment at the advice of Counsel. Needing time to work towards a plea agreement was in all actuality, needing time to have Counsel convince his client to forego: indictment. The "Time to Indict" in the Docket is false indication of the actual events; or perhaps, lack of events. Is it reasonable to expect that the eventual Plea Agreement truly required that many extensions, those many days? It must be noted, in the alternative, that during all those days Counsel did virtually nothing by way of investigation to better his client's position in Plea negotiations. Counsel refused to investigate his client's reports of the events in Dallas, for example; nor did Counsel investigate the chain-of-evidence issues and Federal/State investigation anomalies. Counsel sat, and he waited, status quo, but not for a better plea offer from the

Prosecutor. Counsel sat and waited for Petitioner to sign the
waiver of indictment and plea agreement. The records of the
Prosecutor and Counsel will show, upon examination, that no
extended, hard-fought plea negotiations took place necessitating
Prosecution's requests for more time -·nor the nearly cooperative
and passive non-objection to them by Counsel. An Evidentiary
Hearing would reveal exactly how many different versions of a
plea agreement exist in this case, their dates of authorship,
and any progress, if at all, were made by the parties, and last
of all, in the present analysis, were the **extensions of time honest**
**representations to the Magistrate?** Extensions of Time to (1)
Indict are belied by Prosecution's actual conduct and admissions
thereto; and/or (2) to produce a Plea Agreement are wild mis-
representations by Prosecution in a manipulation of the limita-
tions to submit an indictment.

It should be noted that although pro se, Petitioner's theory
contends that (A) as it stood, the case could not return an
indictment from a Grand Jury had the Grand Jury been supplied with
the data and information of SA Richardson's conduct, lack of
Federal warrant of any type on March 4, 2015, events in Dallas,
and provenance of evidence; (B) Prosecution was waiting on a
State of Rhode Island prosecution which would provide a "clean
hands" washing of the search warrant illegalities and possibly
those in Dallas; (C) a State prosecution would, by its very
existence immensely add credibility to a federal Grand Jury

inquiry ("He's already been indicted in the State...so we [federal Grand Jurors] really just need to go with that."); (D) and once a State proceeding was commenced, any waivers there would automatically be applicable in Federal proceedings. (E) With those waivers in place, a passive Counsel who would not exercise the Petitioner's rights under Rule 12 (objections to evidence, etc.) or Rule 16 (Discovery) could be relied upon to advise his client to sign a Plea Bargain. One small problem with all of that... there was no indictment. It was therefore absolutely imperative that for the Prosecution to obtain a conviction that a waiver of indictment had to first be procured, either through their own foot-dragging, or similar delay unchallenged by Counsel. The final necessary element (F) was to cause the prolongation of the pre-indictment proceedings by means that appeared on the surface to be legal. That required convincing the Magistrate that the Extensions of Time sought were honest and legitimately necessary and strictly for the 'ends of justice'. As stated above, the Court is to expect from the Prosecution as an Officer of the Court assistance in Speedy Trial matters, and not wonton deception. See, Ramirez, 973 F.2d at 39. See also, United States v. Richardson, 421 F.3d 17, 29 (1st Cir. 2005)("The statutory grounds for exclusion of time from the speedy trial clock 'are designed to take account of specific and recurring periods of delay which often occur in criminal cases; they are not to be used either to undermine the time limits established by the Act, or to subvert the very purpose the Act was designed to fulfill.'")(citing

Henderson v. United States, 476 U.S. 321, 333 (1986)(J. White, dissenting). Richardson continues, "the STA explicity prohibits a court from granting[] a continuence 'because of general congestion of the court's calendar.'" (quoting §3161(h)(8)(C)). Cf. United States v. Pringle, 751 F.2d 419, 429 (1st Cir. 1984)(the STA "is as much aimed at the delay caused by judicial congestion and mismanagement as it is aimed at the deliberate stalling of counsel").

When warranted, dismissal may be with or without prejudice. "Although relevant, bad faith is not a prerequisite to employing dismissal as a sanction for misconduct." Vazquez-Rijos v. Anhang, 654 F.3d 122, 130 (1st Cir. 2011)(citing Vallejo v. Santini-Padilla, 607 F.3d 1, 9 (1st Cir. 2010). Case law has set forth factors to determine whether to dismiss with or without prejudice. See, Barker v. Wingo, 407 U.S. 514 (1972)(1. reasons for the delay; 2. length of the delay; 3. defendant's assertion of his rights; 4. prejudice to the defendant)(accord. United States v. Columbo, 852 F.2d 19 (1st Cir. 1988).

> "A fourth factor is prejudice to the defendant. Prejudice, of course, should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect. The Court has identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." Barker, Id. at 532.

Barker, at 530, and United States v. Hastings, 847 F.2d 920,
provide further guidance as to whether a dismissal should be
with or without prejudice.  Namely, (1) seriousness of offense;
(2) circumstances leading to the delay; (3) impact reprosecution
would have on the administration of justice and enforcement of
the STA; (4) any miscellaneous factors, including whether the
delay resulted in actual prejudice to the defendant.  Compare to
United States v. Taylor, 487 U.S. 326, 334 (1988) and United States
v. McCoy, 977 F.2d 706 (1st Cir. 1992).

Most analyses of pre-indictment delay fall under the scope
of Due Process and not the Sixth Amendment.  The standard case
is United States v. Marion, 404 U.S. 307 (1971).  Whereas in
Barker, et al., prejudice usually needs to be shown for a dis-
missal with prejudice; because of the Due Process basis, Marion
does not require such a showing.

Whereas dismissal with prejudice carries the obvious dis-
positive sanction, the Taylor court also observed the deterrent
power of the alternative.

> "Dismissal without prejudice is not a toothless
> sanction:  it forces the Government to obtain a
> **new indictment** if it decides to reprosecute, and
> it exposes the prosecution to dismissal on statue
> of limitations grounds.  Given the burdens borne
> by the prosecution and the effects of delay on the
> Government's ability to meet those burdens, sub-
> stantial delay well may make reprosecution, even if
> permitted, unlikely."  Taylor, 487 U.S. at 342.

"Excludability determinations are reviewed for abuse of discretion." United States v. Vega Molina, 407 F.3d 511, 532 (1st Cir. 2005). We are mindful, however, that a material error of law invariably constitutes an abuse of discretion. United States v. Snyder, 136 F.3d 65, 67 (1st Cir. 1998)"(as cited in Gates, 709 F.3d at 65).

Having discussed the roles and responsibilities of both Counsel and the Prosecutor in Speedy Trial/Indictment contexts, the Circuit has stated that "[t]he role of the magistrate judge is 'to relieve courts of unnecessary work.'" Henley Drilling Co. v. McGee, 36 F.3d 143, 151 (1st Cir. 1994)(quoting Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980). Most salient to Petitioner's particular cirucumstances:

> "A trial court's discretion to invoke the ends of
> justice exception by granting a continuance is
> exceedingly 'narrow,' and should not be done
> 'lightly or routinely.'" Barnes, 159 F.3d at 13,
> (quoting United States v. Mitchell, 723 F.2d 1040,
> 1044 (1st Cir. 1983))(emphasis added).

In Petitioner's case, not only is the actual tabluation of excludable days required, "start[ing] from scratch," both from March 4, 2015 and April 3, 2015, but that the actual granting of the Extensions of Time to Indict by Magistrate Sullivan were:

I.      the result of deceptive representations made by officers
        of the Court; or

II.     the Magistrate (or the law clerks) did not exercise
        due diligence to keep track of the number of Extensions
        requested; or

III.    the Magistrate did not carefully consider the repeated
        requests for time to achieve the same task - all
        without meaningful alteration or specific neccessity
        to warrant (yet another) extension, where, the
        previous extension had failed to achieve its goal(s); or

IV.     the Magistrate Abused her Discretion in authorizing
        the repeated Extensions of Time;

or a combination of these factors.  As with many issues in this
case, an Evidentiary Hearing (or through examination of the
answers to Interrogatories) will provide determinative infor-
mation in this matter.[1]

In the alternative, if the number of Extensions granted (or
its equivalency in days) is asserted by Respondent as not being
an Abuse of Discretion, or a result or unnecessary delay, the
question must be posed: just how many Extensions or days would
be excessive or in violation of Speedy Indictment rules?

Additionally, Federal Rules of Criminal Procedure, Rule 48(b)
"is a restatement of the inherent power of the court to dismiss a
case for want of prosecution." Advisory Committee Note.  This
includes the "inherent power under 48(b) to dismiss a case with
prejudice for prosecutorial delay not amounting to a Sixth

---

1   Respondent has taken umbrage at Interrogatories directed toward Magistrate
    Sullivan.  They are not accusatory, but fact-finding; to determine the
    dates and conditions of Respondent's Extension motions, to include candor.

Amendment violation." <u>United States v. Hattrup</u>, 763 F.2d 376, 377
(9th Cir. 1985). Invoking 48(b) is at the discretion of the
court and will only be reversed for abuse of discretion. <u>United
States v. Pilla</u>, 550 F.2d 1085, 1093 (8th Cir.), cert. den., 432
U.S. 907 (1977). Furthermore, Rule 48(b) permits dismissals not
technically convered by STA when delay may be seen as 'unnecessary'.
(<u>See</u>, <u>United States v. Lane</u>, 561 F.2d 1075, 1078 (2nd 1977).
Sometimes delay may be viewed as so long and unnecessary that a
specific showing of prejudice is not needed. <u>Doggett v. United
States</u>, 505 U.S. 647 (1992)(holding that, among other examples,
delays of about 8 months in serious felony cases should trigger a
judge's inquiry). More directly related to Petitioner's case,
"[Rule] 48(b) applies to unwonted delay in presenting a case to
a grand jury after a defendant comes into federal custody."
<u>United States v. Bouthot</u>, 685 F.Supp. 286, 301 (D. Mass. 1988).
The Magistrate's options were clear, in the face of receiving
another in the series of Extension of Time motions from the
Prosecutor - (1) grant; (2) grant, with instructions or cautions
to the Prosecutor that no further extensions would be allowed;
(3) return to the Prosecutor with instructions to specifically
articulate the need for another extension (and why the last one
did not suffice); (4) deny; or (5) exercise judicial authority
through 48(b). In context/comparison with the in-court management
of Petitioner's Arraignment hearing, it is striking that the
Extensions of Time were granted without scrutiny. In fact, it

was with great attention to inquiry of Petitioner that Magistrate Sullivan asked and confirmed Petitioner's Wavier of Indictment (being aware of its importance, although Petitioner was not), despite the fact that the ongoing pre-indictment extensions granted by the court were contributing factors in wearing down Petitioner's resolve in the face of Counsel's lack of invest- igation and lack of any plea bargain progress, placing Petitioner is legal suspension. At a minimum, the case should have been dropped or dismissed without prejudice. Given the non-indictment proceedings up to that point, dismissal with the requirement for Prosecution to obtain an indictment would have been an appro- priate sanction not requiring any further analysis as to preju- dice to Petitioner. And had the Magistrate more closely scru- tinized the Prosecutor's actions, and those of Counsel, their cooperative lack of candor to the court (and resultant denial of due process to Petitioner) would have warranted dismissal with prejudice. In the Pringle case (supra.) it was decided that a defendant should not be permitted to agree to a plea bargain only to back out of it in order to manipulate the STA. Such manipulation should be also forbidden when (by whatever means) the Prosecution manipulates or "lullabies" the court into not perceiving the STA and/or Due Process rights of the Defendant being eroded. Dismissal of the case is warranted still, both upon the above STA grounds and their origins, but also the cumulative totality of the circumstances of the case.

This summary of standards is intended as a brief checklist, it is not intended to detract from the complex interweaving of case law presented in the body of the Instant Memorandum or any prior Motion before the Court.

The following standards have been met or exceeded:

1. "The sentence violates the Constitution or laws of the United States.... The sentence is 'otherwise subject to collateral attack'" (28 U.S.C. §2255)

2. The [Petitioner] must prove that counsel's performance fell below an objective standard of reasonableness. The deficient performance of counsel prejudiced the defendant, resulting in an unreliable or fundamentally unfair outcome (<u>Strickland</u>)

3. "A single, serious error... can support a claim of ineffective assistance of counsel" (<u>Prou v US</u>, Supra)

4. Petitioner was denied counsel such that there was "no meaningful adversarial testing" that "performance of counsel may be so inadequate that, in effect, no assistance of counsel is provided" (<u>Cronic</u>, supra).

5. The Strickland 'reasonable probability standard' to establish prejudice in the First Circuit is for Petitioner to demonstrate "'that the result of the criminal proceeding would have been different' if counsel had performed as the [petitioner] asserts she should have " (<u>Rivera-Rivera v US</u>, supra) to the extent that it is "sufficient to undermine confidence in the outcome" (<u>Biron v US</u>, Supra).

6. "When a lawyer advises his client to plea bargain to an offense which the attorney has not investigated, [s]uch conduct is always unreasonable" (Woodward v Collins, supra).

7. "'[A defendant] is bound by his plea and conviction **unless** he can allege and prove serious derelictions on the part of counsel sufficient to show that he plea was not, after all, a knowing and intelligent act' (McMann, Supra). "[T]he issue of prejudice necessarily centers upon whether the attorney's failure to competently investigate any material facts prejudiced the defendant's ability to make an intelligent and voluntary plea of guilty" (Dufresne, supra). The waivers that accompany the entry of a guilt plea must be "an intentional relinquishment or abandonment of a known right or privilege" (Johnson v Zerbst, supra).

The following facts of the case fulfil the above requirements in light of the applicability of case law to those facts:

A. The search of the home: Byars, Siverthorne, McGinnis, Bram.

B. The Dallas stop: Miranda, Molina, Riley, Wurie.

C. Prosecutorial misconduct/Due Process violations: Kyles, Brady.

D. Plea agreement: Johnson v Zerbst, Brady, Boykin, McMann, Dufresne.

E. Speedy indictment/speedy trial: Strunk.

F. Ineffective Assistance of Counsel: Strickland, Cronic, Murray v Carrier, Prou, Rivera-Rievera, Woodward v Collins.

This case law represents the necessary tool kit to open and separate each and every nesting Russian doll. It permits the reader to see each layer of constitutional violation, from ineffective assistance of counsel on the outer layer, all the way through to the violations at the home and Dallas that compromised this case from the very start. For a complete layman turned pro se litigator, it was a demanding challange to find, test and apply the law to the facts of this case. What started as intuition that something was terribly amiss at each stage of the proceedings and having that voice silenced by ineffective counsel who admonished "whatever you do don't upset the prosecution or the Court", has been transformed by learning the law, to discover that Petitioner's common sense laymans concerns in fact had a basis in law afterall and that none of this should have ever been brought before a Court. An incredible amount of pain and suffering for Petitioner's fiance and family would have been avoided had effective counsel been retained in the first place, but Petitioner had no idea how to hire an attorney. Thus the system was free to grind on regardless of the merits of the case. Petitoner hopes that he has made a sufficient showing to have this miscarriage of justice reversed and his life restored.

## In Summary

The failures in this case are like Russian nesting dolls. They
start with the illegal conduct of SA Richardson on March 4, 2015
at the home and at Dallas. Those acts are in turn enveloped and
extended/deepened by the prosecutor who chose to use SA Richardson's
tainted evidence. The prosecution adds to prejudical conduct by
general gamesmanship, extensions of time for purposes other than
those presented to the Court, namely to gain a tactical advantage
at Petitioner's expense, resulting in speedy indictment/speedy trial
and due process violations. The prosecution also pushes a plea bargain
so as to avoid Grand Jury procedings that they knew to be high risk
given the above facts. Further, the plea frees them from intensifying
liabities that a post indictment Brady/Kyles/Rule 16 investigation
would have uncovered. All of these factors nestle within the final
Russian doll - the failure of counsel to investigate any of these
troubling issues, the failure of adversarial testing of the consti-
tutionally invalid data/argument/theory put forward by the government,
resulting in a plea agreement based on incorrect information (or ab-
sence of vital information [such as the extistance of multiple
constitutional violations by the government], ignorance of the law
(such as the difference between routine and non-routine border
searches), and incompetant/ineffective advice (arising from above
failings) that neglected to explain how a plea would prevent the
exposure of any machinations of the government in the investigation,
preparation and presentation of its case. A case that it turns out
was shot through with constitutional violations, manipulations of

the court, and a series of increasingly desperate attempts to limit, disguise, or extinguish the grave liabilities that were created by their acceptance of a compromised case, and furthermore by their decision to pursue it employing techniques declared by the ABA and the Supreme Court in Berger as being ethically violative of their duties as Officers of the Court, and cruelly repugnant to the Constitution. All of these factors are evidence of a profound and systematic Ineffectiveness of Counsel in Petitioner's case to passively condone and leave unchalleged the wrongheaded zealotry of the Office of the U.S. Attorney. The sum of illegalities in these Russian dolls are greater than their parts. The U.S. Attorney and Counsel should not hold so cheaply the rights and protections of the Constitution that so many others hold so dear.

This Honorable Court can and should grant relief principally on the matter of Speedy Indictment violations, to enable a full Dismissal of the case outright; alternatively to use same in concert with other claims to achieve Dismissal. Dismissal of the criminal case cannot return to Petitioner the lost days in prison, but through the exoneration Dismissal would bring, would allow Petitioner ADAM COBB an opportunity to return to his particular field of expertise at the Naval War College, and the Department of Defense, to serve, once again, his adopted country, the nation he loves, the United States of America.

## Prayer for Relief

WHEREFORE, in consideration of the facts, circumstances, law, case law, authorities, and discussion set forth above, Petitioner humbly PRAYS the Honorable Court

1. ORDER DISMISSAL of the criminal case, **WITH PREJUDICE**, in consideration of the STA/Indictment violations and failures; in combination with all other granted claims and grounds;

2. ORDER **VACATION** of sentence and **CONVICTION OVERTURNED**;

3. Alternatively, prior to #1 and/or #2, ORDER **EVIDENTIARY HEARING TO BE HELD**, taking under ADVISEMENT Petitioner's REQUEST to be **ORDERED PRESENT** for any such HEARING;

4. ORDER **SUBMISSION** of all **RESPONSES** to Petitioner's Interrogatories by Respondent, and all parties served by Respondent;

and any additional **RELIEF** to which Petitioner may be entitled, deemed fair and equitable by this Honorable Court.

It is so prayed.

Respectfully submitted,


_____          _____
ADAM COBB                                      DATE

---------------------------------------------------------

### Verification
I, ADAM COBB, hereby declare and affirm under penalty of perjury and in accordance with 28 U.S.C. §1746 that the foregoing is a true and accurate document to the best of my knowledge, understanding, belief, and recollection, submitted in good faith and for bad, dilatory, or vexatious purpose.


_____          _____
ADAM COBB                                      DATE

## C e r t i f i c a t e   o f   S e r v i c e

I, ADAM COBB, hereby declare and affirm under penalty of perjury and in accordance with 28 U.S.C. §1746 that the foregoing is a true and accurate document to the best of my knowledge, understanding, and recollection, and that a true copy of same has been filed with the Office of the Clerk, and served upon the Office of the United States Attorney via the United States Postal Service first-class mail with prepaid postage affixed thereunto.


Placed in the U.S. Mail on this date: _____*11 SEPT 2018*_____ .


_____
ADAM COBB


**Mailing Address:**

ADAM COBB
# 09925-070
Federal Medical Center
Post Office Box 14500
Lexington, KY 40512
(Antaeus Housing Unit)


* **NOTE:** Pro se Petitioner ADAM COBB has no access to PACER, nor to the ECF system. All data to and from the United States District Court; Office of the Clerk; and/or the Office of the United States Attorney shall be conducted by postal service via the United States Postal Service.

Per Bureau of Prisons/FMC Lexington regulations, Pro se Petitioner ADAM COBB has no access to Overnight Mail service, nor Two-Day Mail service, nor any mail or parcel service by or through private companies, e.g., Federal Express, U.P.S., D.H.L., et al.