IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

ADAM COBB,                          )
    Petitioner,                    )
                     )
          v.                        )  Civil:    1:18-cv-00051-JJM
                     )  Criminal: 1:16-cr-00006-JJM-PAS
UNITED STATES OF AMERICA,           )
    Respondent.                    )
_____)

## PETITIONER'S REPLY TO THE GOVERNMENT'S RESPONSE

NOW COMES the Petitioner, ADAM COBB, pro se, and hereby SUBMITS to the Honorable Court the instant REPLY in Case Number 1:18-cv-00051-JJM.  Petitioner appears pro se and as such PRAYS all favorable construction and application of the instant REPLY from the Honorable Court.  See, e.g., Haines v. Kerner, 404 U.S. 519, 520 (1972); United States v. Mosquera, 845 F.2d 1122, 1124-25 (1st Cir. 1988), et al.

### Summary of the Reply

1.  The Government's Response (Dkt. #93) and its earlier Response (Dkt. #84), incorporated by reference within Document 93 [see page 2, lines 2-5 therein], requires Petitioner to Reply and factually assert that,

    **(1a)**  As an operation of legal procedure, the Government has conceded numerous assertions and positions of Petitioner as set forth during this litigation.  Unchallenged, they must stand as the law of the case, the res judicata, as this matter proceeds to the Court for adjudication and Final ORDER.

- 1 -

(1b)   The Government has, in Documents 84 and 93, made numerous assertions to the Court that are in fact, entirely false.   Petitioner posits that these false statements, mis-characterizations, and untruths have all been submitted by the Government attorneys as the official position of the Respondent, who have submitted same knowingly and sworn under penalty of perjury.

2.   The Court issued its ORDER of 11/16/2018 (Dkt. # 95) prema-turely, in either a plain error or an abuse of discretion, prior to any submission of a Reply to the Government's Response having been filed by Petitioner.

(2a)   Although at present the ORDER has been stayed pending the submisison of the instant REPLY, the prima facie indica-tion is that the Court had pre-judged or predetermined the ORDER prior to any judicial analysis and review of a Reply from Petitioner.

(2b)   Furthermore, the Court's ORDER (Document 95) applies a judicial finding exclusively based upon Petitioner's **first** Memorandum of Law, without commenting or otherwise recogni-zing Petitioner's Amended Memorandum of Law.   Similar to point (2a) above, the prima facie indication is that the Court's ORDER was further pre-judged or predetermined by the Court, having been authored entirely based on the original Memorandum of Law.

- 2 -

(2c)  Finally, the ORDER of the Court, having been apparently based upon the first Memorandum, further indicates that there was no consideration of any of the claims in the Amended Memorandum, insofar as the text of the ORDER does not reflect any contemplation of the legal theories set forth in the Amended Memorandum, and is entirely devoid of any comment or reference to the relevant case law in the Amended Memorandum that should limit, bind, or otherwise direct the Court in its decision.

## The Government's Response

The Responses of the Government, insofar as false statements untruths, and mischaracterizations are concerned; and for purposes of refutation by Petitioner, see the point-by-point rebuttal in ATTACHMENT "A".  Whether individually or by cumulative measure, the statements by the Government warrant a favorable reading for Petitioner.

The incorporation of false statements, mischaracterizations, and the like are one-half of the Government's strategy, the corresponding part is to avoid the facts and legal arguments by Petitioner, and to rather talismanically recite and repeat salacious details and text.

Neither of these two parts directly address the claims of Petitioner, whether it is Ineffective Assistance of Counsel, conduct of law enforcement, conduct of prosecution, etc.  As to Ineffective Assistance, their Response does not provide any

- 3 -

evidence to support their assertion (opinion, not fact) that there were "skillful negotiations" by Counsel, and that there were "several months of intense negotiations." No record of meetings, no record of written communications, no appointment book records, etc. The position of Respondent has been focused exclusively on the length of sentence as the measuring tool for effective assistance. The underlying 'it could have been worse' subtext cannot and does not serve as a valid legal rebuttal. Relying upon outcome-based analysis and not the facts and conduct of Counsel at the time, such a response is mere gainsaying.

The Court in Strickland specifically forbids any post hoc analysis of Counsel's conduct, although the context is usually when such types of assertions are made by petitioners. Nevertheless, as per Strickland, this Court is not permitted to entertain any such post hoc analysis of Counsel's effectiveness based on eventual outcome, but rather to analyze the actions and conduct of Counsel at the moment such conduct occurred, and based exclusively upon what can be proven was Counsel's knowledge of the facts of the case at that time, which, would then either support or not support the presumption that Counsel did, in fact, conduct himself to the prevailing professional norms having conducted (at least to that particular juncture of the case) all necessary investigations or consciously having made the professional decision that such investigations were not necessary. Given this clear instruction from the Supreme Court in Strickland, the Government's position and outcome-based

- 4 -

assertion that Counsel was effective is legally impermissible
for consideration by this Court in the instant case. To
summarize, neither the Government nor Counsel have provided any
documented evidence or sworn affidavits to prove the existence
of the aforecited "intense" and "skillful negotiations". And
if such negotiations were entered into by Counsel, there is no
proof that these were conducted after, or even during, Counsel's
investigations of the facts of the case and exploring any legal
defenses based upon Counsel's investigations and interviews, and
not exclusively relying on the fact-assertions by the Government.
Just as Strickland has established that the Counsel for the def-
endant must make a professional judgment (under prevailing norms)
to investigate or determine such investigations are unnecessary,
it is also well-settled in Strickland's progeny case law that
it is not effective assistance to rely entirely upon a review
of the Government's case files in making that determinative
judgment, or in lieu of defense Counsel's own, independent
investigations. Effective Assistance of Counsel is neither
a warm body next to a defendant in the courtroom, nor a rubber
stamp of passive approval or endorsement of the Government's aims.

Continuing, absent any proof of investigation by Counsel,
any advice to effectively admit guilt and enter a plea agreement
is categorically deficient to prevailing professional norms.
As Petitioner's assertion is that Counsel conducted no meaningful
investigations into key elements of Petitioner's case, and in
the context that a Movant's assertions are true unless and until

- 5 -

refuted with evidence by the Respondent, the Government has
failed to refute Petitioner's assertion that Counsel was
ineffective for failing to independently investigate the facts
and circumstances of Petitioner's case both prior to and during
plea negotiations with the Government, and most saliently, prior
to advising Petitioner to enter into a plea agreement - a
plea agreement following the advice to waive the filing of an
indictment (which may subject the Governemnt's case to some
inquiries by the Grand Jurors as to matters of police conduct,
jurisdictional concerns, etc.), rather than put the Government's
case to the constitutionally-mandated adversarial test.

Petitioner's case, in comparison to numerous cases (in the
hundreds) that Petitioner has read during the instant litigation,
was unique in many key respects, unique enough to warrant Counsel
to conduct investigation of those elements and circumstances on
behalf of his client. (This is especially the case if we are
to consider in arguendo the Government's position. To wit, the
case was 'open and shut', and that "several months" of plea
negotiations were taking place.) If it could only serve to
assist his client to remove the 'open and shut' case, and that
Counsel presumably had several months with which to work, Counsel
should have investigated the legality of the airport stop (in
furtherance of an ongoing criminal investigation - not a routine
border stop - see, United States v. Molina-Gomez, 781 F.3d 13
(1st Cir. 2015)). In both Molina and Cobb's cases, the searches
were in furtherance of ongoing criminal investigations, and not

- 6 -

subject to the 'routine border search' rules from <u>United States</u>
<u>v. Montoya de Hernandez</u>, (473 U.S. 531, 538 (1985)), nor
<u>Almeida-Sanchez v. United States</u> (413 U.S. 266, 272-73 (1973)).
As with the above, the other cases cited by the Government in
their Response fail to distinguish themselves <u>with</u> <u>Molina</u> and
Cobb, but rather distinguish themselves to establish that the
only case most closely resembling Petitioner's is <u>Molina</u>.  The
critical element of 'being in furtherance of an ongoing criminal
investigation' is absent from all of the Government's cases.
Ergo, their case law fails to support their position in Petition-
er's case with its specific details.  Conversely, the decision
in Molina was published and available to Counsel at the time of
Petitioner's proceedings.  Counsel's failure was either to know
the prevailing law of the First Circuit vis-a-vis his client's
unique circumstances, or to fail to investigate First Circuit
cases that would provide grounds for a defense, owing to the
similarities of the search and underlying circumstances.

<u>Molina</u> applied to Cobb

<u>Molina</u> held that "questioning conducted by the officers in
a small, windowless room violated [Molina's] Fifth Amendment
rights because he was not given his Miranda warnings prior to
being questioned" and that he "was entitled to determine for
himself whether he still wished to plead guilty given the
suppression of [] statements [made under those conditions].
<u>Molina</u>, 781 F.3d at 13.  However, to begin as rebuttal to the
Government, their use of <u>Montoya</u> is inapplicable as relates to
even where it was applicable in <u>Molina</u>:  "'Non-routine searches

- 7 -

by contrast, require reasonable suspicion.'" Molina, at 19
(quoting Montoya, 473 U.S. at 541-41). Here, where Molina
as Appellant failed to establish his search as 'non-routine',
Petitioner does so eatablish. Molina's case involved the
smuggling of narcotics, as did Montoya. In both cases, the
the independent assessments of the Border Agents in the commis-
ssion of their routine duties led directly to the searches and
their ultimate extents. Neither Montoya's nor Molina's stop
and search were in the context of an ongoing criminal invest-
igation. Cobb's case is opposite on both issues; his was a
non-routine search as an extension of an ongoing criminal
investigation. Furthermore, Cobb's case (and the subject of
the search) involved not drugs, but rather, a cellphone.

Respondent has provided no evidence as to the exact conduct
(words and actions) of the border agents in Cobb's case - neither
video evidence, audio evidence, nor any sworn affidavits by the
officers to refute the description of events set forth by Pet-
itioner.[1]   For purposes of this iltigation, Petitioner's
account of events, until refuted, is accepted as true. The
pre-identification and pre-determination by Border Agents to
conduct an investigative stop-search-interview and potential
seizure is borne out by the facts, and serves to both **dis**-prove
any assertion that the stop was in any way random or routine,
and affirmatively prove the intent aforethought to subject

_____
1  In summary, the automated border-pass service Cobb used (as a D.O.D. con-
tractor) denied Cobb entry, directing him to a Border Agent.  That Agent knew
Cobb's identity and honorific ("Dr.") -which appears nowhere on his travel
documents nor flight manifest- prior to Cobb identifying himself.  Cobb was

Cobb to a custodial or investigative interview, outside of the
neutral public customs area, and within a customs interview room
beyond locked doors and escorted there by customs officials,
all of which in furtherance of an a continuing criminal invest-
igation, where, in Cobb's particular case, any and all searching
of the cellphone was simultaneously conducted during the cus-
todial interview without any consent or valid warrant, and
possibly additional searching _after_ the seizure of the cellphone
also without consent nor warrant.  Petitioner never signed any
waiver nor granted any form of consent to border agents during
the custodial interview to search and seize the cellphone.  The
Respondent in this case has never proven otherwise.

"Both 'custody' and 'interrogation' must be present to
require _Miranda_ warnings."  _Molina_, at 18 (citing, _United States_
_v. Fernandez-Ventura_, 85 F.3d 708, 710 (1st Cir. 1996).  _Molina_
continues,

> "Custody exists where there is 'a formal arrest or
> restraint on freedom of movement of the degree ass-
> ociated with a formal arrest.'  Though custody is
> a somewhat amorphous concept, relevant considera-
> tions in a custody determination include, but are
> not limited to, 'whether the suspect was questioned
> in familiar or at least neutral surroundings, the
> number of law enforcement officers present at the
> scene, the degree of physical restraint placed
> upon the suspect, and the duration and character of
> the interrogation.'" (citing _Fernandez_, _Id_., and
> quoting _United States v. Masse_, 816 F.2d 805, 809
> (1st Cir. 1987).

(footnote 1 continuted) escorted to an interrogation room and questioned,
then brought to a second such room -both rooms non-public and non-neutral
without windows- and custodially interviewed by numerous agents, with one
such agent taking possession of Cobb's cellphone, removing it from his
presence and conducting a search of its contents (digital data).  The
cellphone was seized, no receipt was provided to Cobb, and he was permitted
to leave after an interviewing process of approximately two hours.

At this juncture, an evidentiary hearing is called for, in context of Counsel's failures to investigate the Dallas stop, obtain the audio and/or video tape evidence of the stop and interview, and to take depositions from the Dallas officers. A relatively straightforward viewing of the audio/video tapes from Dallas would (a) confirm Petitioner's testimony and assertions about those events; (b) etablish the exact conduct of the officers; (c) establish the exact conditions of the rooms; (d) the questions asked; (e) any Miranda or other waiver issues; (f) location of the cellphone at all times during the interview process; (g) prove that no exigent circumstances existed; and (h), the exact conduct and verbal answers of Petitioner.

Such an examination would clearly establish for the Court Petitioner's assertion that Molina applies respective to the statements of Petitioner per no-Miranda-warning (thereby entitling Petitioner the opportunity "to determine for himself whether he still wished to plead guilty given the suppression" of those statements - Molina 781 F.3d at 13); and would further go to establishing that (a) Counsel was ineffective for NOT investigating these Dallas matters and conducting deposition interviews; to (b) determine if the Dallas stop, due to its circumstances and collective, sequential events rose to the level of being viewed as a custodial arrest for purposes of (b1) Speedy Trial Act calculations and (b2) other extrajurisdictional issues such as arrest without warrant, (b3) failure to arraign in the ND of Texas, and (b4) starting the clock for a defendant to be

- 10 -

brought before a magistrate in the nearest federal court in the
District of arrest within the prescribed 3-day period; etc.  The
unique nature of the Dallas stop, combined with the numerous
permutations that could clearly benefit and not prejudice his
client, each of which individually or in concert further viti-
ating the Government's case, videlicet, reducing or removing any
benefit the Government sought to gain, after the fact, from the
questionable actions of SA Richardson and his directions to the
Dallas officers, the events in Dallas, and the conduct of the
Dallas officers themselves.  Counsel's non-viewing or non-review
of the audio/video tapes from Dallas [which necessarily exist per
standard HSI policy] cannot be considered a strategic choice
after investigation, nor a constitutionally sufficient choice
to forego such cursory investigations per prevailing professional
norms within the 390 odd days between the Dallas stop (3/4/2015)
and the waiver of indictment/plea agreement (4/3/2016).  Even
with nearly 400 days to contemplate dedicating a couple hours
to make the above audio and video review, Counsel found no
time, rhyme, or reason to do so.  This conduct does not comport
with Strickland.  The outcome or prejudice prong is satisfied
given 'confidence in the outcome' per the Molina renewed oppor-
tunity to consider plea or proceed to trial.  Lastly, had
Counsel engaged his own forensic analyst to examine the cellphone
(even if under RISP supervision), he would have been able to
establish any illegal search or access to the internal files
(in violation of United States v. Wurie / Riley v. California)

- 11 -

pre-dating Magistrate Sullivan's federal search warrant for the
cellphone which was (1) granted in the context and understanding
that NO search had been conducted prior to the application for
the warrant, and (2) granted prospectively only, authorizing
access and searching after the execution of the Order and not
ex post facto authorizing any earlier pre-warrant searching.
Despite any Rhode Island cellphone search/seizure warrant author-
ization, these above described actions by law enforcement ran
afoul of Petitioner's constitutional rights, are opposite to
the  rulings in Wurie and Riley, and in additional context of
the Dallas stop itself, entirely invalidate the cellphone and
its contents for purposes of the federal case (even if the
cellphone was not so invalidated for the Rhode Island prosecu-
tor, via proper Elkins application, although this point is moot
for the instant case.).[1]  As with the Dallas stop video tape
viewing and its potential for assisting his client, here too
Counsel fails to identify the weak points of the Government's
case regarding evidence collection and handling, fails to put
them to the adversarial challenge [preferring the Government's
obtuse and self-serving account of events rather than investigate],
and failing to grasp the legal principles that apply, and from
which viable strategies could be formulated.  Failing to challenge
the constitutionality of the cellphone's contents through the
legal theory(ies) shown above cannot be considered effective

---

[1]  The absoulute lack of federal authorization regarding the cellphone prior
to Magistrate Sullivan's ORDER is further evidenced by the Dallas federal AGENTS (
who have 'presumably' followed legal federal orders and procedures, DO NOT
send the phone to federal authorities, but instead to RHODE ISLAND St. Pol.

assistance of counsel. Any plea advice provided by Counsel to Petitioner, in consideration of these failures to investigate and failures to discover the weaknesses in the Government's case cannot be characterized as having provided the requisite plea advice under Brady v. United States and/or Padilla v. Kentucky. Evidentiary hearing is also required to determine the extent and nature of plea discussions and plea advice given to Petitioner by Counsel, not only to establish the basis for Counsel's advice (in a Strickland/Hill v. Lockhart analysis) but also to establish whether Counsel correctly advised Petitioner regarding the waivers (in specific-**not** merely generally) that procedurally attach to the waiver of indictment and also those that attach with the entry of a guilty plea. Most salient to the instant case, the conduct of law enforcement and SA Richardson, and by extention the Dallas officers, and the very connection between Richardson and those agents. These points have all been questionable at best, unlawful at worst as presented in this litigation. In the Strickland context-at-the-time-of-the-advice view, Counsel failed to challenge the actions during the 400 day pendency of the case, and through failing to advice Petitioner of waivers upon accepting a plea, he created a bar for Petitiner to overcome to raise the issue herein. The waiver/forfeiture impact of a guilty plea, once accepted by the court **was** known to Counsel at the time of the advice to Petitioner, but not known to Petitioner until his §2255 research.

- 13 -

This waiver, and others, resulting from the entry of the guilty plea were not a knowing and willful act of Petitioner, and were furthermore a subsequent procedural result to the non-investigated non-government-challenged guilty plea advice of Counsel.[1]  Given Petitioner's present claims in the §2255, these failures of Counsel are especially odious.  It was both unprofessional and reckless for Counsel to advise Petitioner to enter into a plea agreement without investigation and without clear instructions to Petitioner as to the exact rights he would be waiving upon entry of his guilty plea.  See, Tollett v. Henderson, 411 U.S. 258, 267 (1973)(after guilty plea, Petitioner "may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea.").  In addition to the above search, seizure, evidence handling, jurisdiction, officer misconduct, and non-Miranda statement issues, the waiver also effects the Speedy Trial rights of Petitioner.  United States v. Gonzalez-Arimont, 268 F.3d 8, 11-12 (1st Cir. 2001)(speedy trial is non-jurisdictional and waived by guilty plea).  As shown below, had Counsel been 'keeping an eye on the (STA) clock', his advice to plead guilty should have been attenuated at least, or at best to not advise Petitioner to plead guilty, both for waiver purposes, but also the contemporaneous developing 5th and 6th Amendment ramifications of Petitioner's case on January 27, 2016.

[1]  Neither the Gov't nor Counsel have rebutted the plea advice allegations by Petitioner.  If not ruled in Petitioner's favor, an Evidentiary Hearing is merited.  See, Rivera-Alicea v. U.S., 404 F.3d 1 (1st Cir. 2008)(remand for Ev. Hearing to resolve whether Counsel was ineffective for failing to subpoena witnesses); U.S. v. Wood, 879 F.2d 927 (DC Cir. 1989)(remand to determine if failure to move for suppression is ineffective assistance).

- 14 -

**Speedy Trial violations proven by Petitioner have not been disproven by Respondent**

Petitioner's reply to the Government's position and argument on the Speedy Trial/Indictment issue contains four elements:

(I)    the Fifth Amendment due process analysis for delay;

(II)   the time/place of the Speedy Trial/Indictment clock commencement;

(III)  the events occurring after that commencement; and

(IV)   prejudice.

As a rebuttal to Respondent, Petitioner summarizes his position showing that under either the Fifth Amendment or Sixth Amendment, or a combination thereof, he is entitled to relief, and at a minimum, given the facts and circumstances, the matter is one upon which jurists could possibly disagree.

To begin, any waiver of these issues by Petitioner arose distinctly and subsequentially to the unknowing nature of the plea (per the Brady v. United States; Padilla v. Kentucky, et al. analyses), and that entry into plea agreement arose from Counsel's (1) failure to know the law (border search, border search-in-furtherance-of-an-ongoing-investigation, nature and length of search/investigative interview constituting arrest) and (2) failure to investigate these matters (and others) before, during, and after the Dallas stop, to include witnesses and the participating law enforcement officers. It is under this overarching set of circumstances that Petitioner's claims must be examined.

- 15 -

I.     Fifth Amendment/Due Process analysis - with the Criminal
       Complaint as the formal commencment of the case.

The delay in Prosecution filing the Criminal Information

and/or its entry into the record in lieu of Indictment (arising from

Counsel's advice to Petitioner to so waive) requires that these

events "must be scrutinized under the Due Process Clause, not the

Speedy Trial Clause." United States v. MacDonald, 456 U.S. 1, 7

(1982).  Actual prejudice to his right to a fair trial [not a

trial outcome] resulting from the delay must be shown (United

States v. Capone, 683 F.2d 582 (1st Cir. 1982), and bad faith on

the part of the Government must be demonstrated.  United States v.

Ciampaglia, 628 F.2d 632, 639 (1st Cir. 1982), such as the delay

was "an intentional device to gain tactical advantage over the

accused," (United States v. Marion, 404 U.S. 307, 324 (1972)),

or "in reckless disregard of circumstances known to the prose-

cution, suggesting that there existed an appreciable risk that

delay would impair the ability to mount an effective defense."

United States v. Lovasco, 431 U.S. 783, 795 n.17 (1977).   In

Petitioner's case and for this analysis, as no Indictment was

ever filed, there was no path to a fair trial, or any trial for

that matter (Capone).  Petitioner's freedom of movement, employ-

ment and ability to earn a living and pay expenses, liberty, and

overall pursuit of happiness were all put 'on hold', suspended

indefinitely with no indictment being filed and no indication

that the case would be dropped.  Petitioner was in limbo, placed

there as a direct result of the specific course of action chosen

- 16 -

by Prosecution to not indict as a matter of course.  Accordingly,
Petitioner's stress levels were steadily increased throughout,
respective not only to the above (particularly employment and
earnings) but also the potential loss of witness memories that
Petitioner had hoped to secure through testimony on his behalf or
to impeach Government witnesses.  This all worked to Petitioner's
disadvantage to lessen his resolve to not vigorously challenge
or question Counsel's advice, but to instead (with no indictment
anywhere on the horizon) accept Counsel's advice to waive the
indictment and accept the plea agreement.  In short, the Government
knowingly and willfully "wore down" Petitioner, measuring their
effectiveness possibly from communications with Counsel, where
they could infer whether Petitioner was ready to acquiesce.
See, Marion; Ciampaglia.  Here the 5th Amendment Due Process
rights violations and prejudice arising therefrom have been shown.
[Witnesses include Maryland accuser; Dallas officers; SA Richardson;
U.K Citizen; "unknown recipient"; Rhode Island forensic analysist;
Rhode Island search warrant executing officers; over 12 witnesses.]

II.    Sixth Amendment Speedy Trial/Indictment violations

    This analysis first requires the identification of the comm-
encement of that right when a defendant is "indicted, arrested,
or otherwise formally accused."  MacDonald, 456 U.S. at 6; accord
Lovasco at 788; Marion at 320.  Parsing out this set of terms for
Petitioner's case, there was no indictment.  The events in Dallas,
arising from the information provided by SA Richardson for Dallas
officers to act subsequent to an ongoing Rhode Island search -in

- 17 -

and of itself- can qualify as a 'formally accused' state (given
that Richardson's request (as confirmed by the Government's
Response) was in furtherance of or an extension of the Rhode
Island search/seizure and not strictly one of valid or legal
entry into the U.S.), or **alternatively** qualifies as a custodial
stop and investigative interview, that, through the events and
circumstances of same, arise to the level of arrest, for <u>Miranda</u>
and other arrest analysis purposes on March 4, 2015. <u>See</u>, e.g.,
<u>Molina</u>, supra. at 22 (citing <u>United States v. Pratt</u>, 645 F.2d
89, 91 (1st Cir. 1981).

A second potential operative date for the <u>MacDonald</u> "arrested,
or formally accused" date is April 3, 2015, occurring in Rhode
Island where Petitioner was taken into custody. **[Note:** in the
Responses and filings by Respondent, these two dates "3/4 and
4/3" have been interchanged, whether purposeful or in error, to
further confuse matters due to the transposable similarity of
the dates in that numerical rendering. The two dates are not
the same, and the events on the two days are also different.
Most saliently, there was NO ARREST WARRANT at all, under any
judicial order in any jurisdiction for Petitioner on March 4,
2015; only a search and seizure warrant for property found in
the home of Petitioner and on the premises of his real estate;
<u>not</u> his person if he was elsewhere].

The third potential operative date is April 2, 2015, the
date the criminal complaint was filed, <u>see</u>, Docket #3.

- 18 -

In short, and absent any adjustments for Excludable Time, the
starting points to the wavier and plea date of 1/27/2016 provide:
With Dallas on March 4, 2015 as the operative date, a total of
**328 days** elapse prior to January 27, 2016.
With Rhode Island dates of April 2, 2015 or April 3, 2015 as the
operative dates, totals of **299 days** or **298 days** (respectively)
elapse prior to January 27, 2016.
These will each be examined in turn.

III.    **Events after formal accusation**

The Barker v. Wingo (407 U.S. 514, 530 (1972)) test examines
four factors: (a) length of delay; (b) reason for delay; (c)
defendant's assertion of his right; and (d) prejudice to the
defendant.  However, neither does the mere existence of one of
these factors guarantee "the finding of a deprivation of the right
of speedy trial," nor does there exist a requirement that any of
these four is an absolute requisite for such a finding.  Id. at 533.
For purposes of the instant REPLY, (d) has been articulated above;
and (c) has been exercised or asserted as soon as Petitioner knew
of and could so assert such a right, namely within the §2255.

**Excludable Time**

Part (a) and (b) of the Barker test are generally examined
in tandem as a "double enquiry".  Doggett v. United States, 505
U.S. 647, 651 (1992).  The reason for the delay establish grounds
for deduction of excludable time.  "The length of the delay is both
the trigger for analysis and one of the factors to be considered."

- 19 -

United States v. Columbo, 852 F.2d 19, 24 (1st Cir. 1988).

Following Barker, "a court must still weigh all of the factors

before deciding whether a defendant's right to a speedy trial has

been violated." Id. at 23.

Given this, the analysis begins with the Speedy Trial Act.

The Speedy Trial Act requires the filing of an indictment within

30 non-excludable days and the commencement of a trial within 70

non-excludable days. See, §3161, et seq.

## SCENARIO A – Dallas as the operative date

If March 4, 2015 is the operative date, the indictment, per

the STA was due by April 3, 2015. As the first motion by the

Government in the case for an Extension of Time was April 16,

2015, that element is moot, and no days are excludable. As such,

under this analysis, without any request for, nor any order granting

an "Ends-of-Justice" extension, the STA was violated as of

April 4, 2015. **[NOTE:** the Government's Motion of April 16, 2015

was prospective only, requested no nunc pro tunc application, and

was GRANTED as prospective only**].**

In this Scenario, the STA has been violated, Petitioner was

prejudiced, and the case requires DISMISSAL. "The Sixth Amend-

ment provides that all criminal defendants 'shall enjoy the right

to a speedy and public trial.' U.S. Const. amend. VI. If the

government violates this constitutional right, **the criminal**

**charges must be dismissed.** Strunk v. United States, 412 U.S.

434, 439-40 (1973)(cited, quoted in United States v. Dowdell,

595 F.3d 50 (1st Cir. 2010).

- 20 -

SCENARIO B - Rhode Island, April 3, 2015 as the operative date

In brief, April 3 to April 16 (extension motion day) renders 12 non-excludable days. Between Dkt. 22 and Dkt. 23, 1 non-excludable day. Between Dkt. 24 and 27, there are 5 non-excludable days. Between Dkt. 28 and 29 there are 10 non-excludable days. And from 11/23/2015 to 1/8/2016, there are 3 non-excludable days. [NOTE: this calculation takes into consideration the time where Magistrate Sullivan was taking submitted Motions under consideration, and therefore under the STA, excludable.] See footnote 1.

Additionally, Scenario B is set forth under the premise, in arguendo, that all of the Extensions of Time that were sought were granted for the reasons sought, and were lawful in every respect to the "ends-of-justice" requirements for Excludable Time. Scenario B results in 31 non-excludable days and requires DISMISSAL.

SCENARIO C - Analysis of Extension(s) of Time in context of
      i.   Respondent's contradictory positions, and
     ii.  Requirements under the STA

The record shows that the Government sought Extensions of Time to Indict. See, Docket. In the §2255 litigation, the Government has stated the Extensions were for Plea Negotiaitons, and specifically not to obtain an Indictment, going so far as to boast in their Responses that an indictment "would have been easy to obtain" had they chosen to do so. Before continuing with the STA Sixth Amendment analysis, Petitioner asks the Court to consider this willful choice to not indict in light of the

---

1  Scenario B1 - if April 2, 2015 is determined to be the operative date, given the content of the Docket on that date, then 32 non-excludable days had occurred by January 27, 2016. Scenario B provides 31 non-excluable days. Both scenarios require DISMISSAL. Dowdell citing Strunk, supra.

Due Process Fifth Amendment analysis set forth supra. as a
manipulation to entirely avoid the STA strictures (by choosing
to not indict) thereby denying Petitioner his Due Process rights
to be in position to invoke his Sixth Amendment Speedy Trial
STA rights. See MacDonald, Capone et al. supra. Here, the
actions of the Government violated the "fundamental conceptions
of justice which lie at the base of our civil and political
institutions and which define the community's sense of fair play
and decency." Lovasco, 431 U.S. at 789-90.

Returning to the Sixth Amendment STA analysis, this Circuit
has stated,

> "The statutory grounds for exclusion of time from
> the speedy trial clock 'are designed to take account
> of specific and recurring periods of delay which
> often occur in criminal cases; they are not to be
> used either to undermine the time limits estab-
> lished by the Act, or to subvert the very purpose
> the Act was designed to fulfill.' Henderson v.
> United States, 476 U.S. 321, 333 (1986). Accordingly,
> we have repeatedly cautioned that neither counsel
> nor district courts may employ measures for excluding
> time from the speedy trial clock that impermissibly
> frustrate the STA's purpose of protecting the shared
> interest of criminal defendants and the public in
> 'bringing criminal charges to the bar of justice as
> promptly as practicable.'" United States v. Richard-
> son, 421 F.3d 17, 29 (1st Cir. 2005)(citing Henderson
> v. U.S.; and United States v. Hastings, 847 F.2d
> 920, 923 (1st Cir. 1988).

More recently, this Circuit has specifically commented on

> "§3161(h)(7)3 -- commonly referred to as the 'ends-
> of-justice' provision -- permits the court to exclude
> delays resulting from continuances granted 'on the
> basis of [the judge's] findings that the ends of
> justice served by taking such action outweigh the
> best interest of the public and the defendant in a
> speedy trial.' 18 U.S.C. §3161(h)(7)(A). As a
> permissive, rather than automatic, exclusion, the

- 22 -

> trial court is required to affirmatively 'set[] forth,
> in the record of the case, either orally or in writing,
> its reasons' for granting an ends-of-justice contin-
> uence." United States v. Valdivia, 680 F.3d 33, 39
> (1st Cir. 2012).

Valdivia continues that a court "need not recite a formulaic recitation of the ends-of-justice language, but it **must articulate the reasons that support** an ends-of-justice continuance." Id. at 40, citing Zender v. United States, 547 U.S. 489, 506-07 (2006) (holding that "the Act requires express findings," and that a mere "passing reference to [a] case's complexity" would be an insufficient basis); and United States v. Pakala, 568 F.3d 47, 60 (1st Cir. 2009 ("[A] district court must make on the record findings justifying the grant of 'ends-of-justice' continuance."). The finding must be contemporaneous to the original case, and cannot be supplied ex post facto on remand or §2255 review. Zender, at 506.[1] The first matter is one of determining whether the stated request in the Extension motions match the Docket or the recent position of 'plea negotiations' in this §2255. They cannot be both. Neither can the Magistrate grant any Extension for either purported purpose without making the requisite findings and also stating her reasons for Granting the Extension. Continuing, the Magistrate cannot grant the request based upon grounds never submitted in the request (abuse of discretion), nor substitute the ground which she would deny for one that she would grant, on behalf of the Government (abuse of discretion).

---

[1] Petitioner's Discovery Motions under Rule 6 were partially submitted to determine and establish the grounds under which the Extensions were submitted, the grounds under which they were granted, and any stated reasons underpinning any on-the-record findings.

- 23 -

As to the Government's position in this litigation, that the Extensions were sought for Plea Negotiation purposes, it must be noted that within the First Circuit, plea negotiations are not automatically excludable within the meaning of being 'clear or obvious', thereby affirming that Magistrate Sullivan definitely was required to state her reasons for granting any excludable time Extensions for plea negotiation purposes. Valdivia, 680 F.3d at 42; United States v. Huerte-Sandoval, 668 F.3d 1, 7 n.8 (1st Cir. 2011). In any analysis, it is one determining abuse of discretion based on 'reasonableness'. United States v. Barnes, 251 F.3d 251, 256 (1st Cir. 2001)(reasonableness serves as the touchstone of an 'ends-of-justice' analysis); United States v. Vega Molina, 407 F.3d 511, 532 (1st Cir. 2005)(STA excludability determinations are reviewed for abuse of discretions). Material errors of law invariably constitute an abuse of discretion. United States v. Snyder, 136 F.3d 65, 67 (1st Cir. 1998).

If Motions for Extensions of Time were made for Obtaining an Indictment        **(or)**      Plea Negotiations the Motion must have been granted for that same reason, to include the reasons set forth by the Magistrate in order to warrant the Ends Of Justice excludability, **and furthermore,** followed by the conduct by the Government that aligns directly with the purpose set forth in their request motion.

Most directly, if Magistrate Sullivan granted Ends-of-Justice extension with reasons in the record for Obtaining an Indictment,

- 24 -

and instead, the Government engaged in Plea Negotiations, those days are **not excludable** by the legal operation that the Magistrate did not grant the Extension under those terms, and as such <u>could not</u> have made any reasons in the decision known in the record, for the simple fact that the decision was made on other grounds. The two reasons for Extensions in question are not interchangable **nor even work toward the same goal.** They are mutually exclusive.

If no reasons were set forth, the time is non-excludable per the error of the Magistrate (given that plea negotiations are not automatically excludable). If, however, the Government requested on one ground, but actually used the time for another purpose, then the (a) time is non-excludable as described above, and (b) is further prejudicial to Petitioner and a willful circumvention of the STA by the Government.

Alternatively, if the eight extensions were for plea negotiations occurring prior to the filing of the criminal information (they were), the 5th Amendment Due Process deprivation has occurred. #1 no clear documented set of charges put before the Defendant, memorialized in writing from which/upon which he could know what he is being charged with and prepare a defense; #2 a circumvention of the STA rights of Defendant, no indictment= no defendant's motion for dismissal; #3 the elements enumerated herein and in <u>Strunk</u>; #4 state of perpetual delay and stagnation of case and other Barker prejudice factors. <u>See also, United States v. Scott</u>, 180 F.Supp. 3d 88, 95 (Dist of Mass., 2015)

- 25 -

(pretrial delay can be considered presumptively prejudicial, alleviating any need to analyze the other <u>Barker</u> factors)(citing <u>United States v. Munoz</u>, 487 F.3d 25, 60 (1st Cir. 2007)

Conversely, if the Responses are to be accepted as the Government's final position, that there was no indictment sought at all (regardless of any alleged theoretical ease to so obtain), the above four points are proven by different, deductive means.

Lastly, if the Extensions were for indictment purposes, sought and granted for same, to include stated reasons by the Magistrate, <u>any</u> use of that time for plea purposes in lieu of seeking an Indictment satisfied Petitioner's 5th Amendment Due Process claim, that the Government did not act in good faith.

A comparison to another case from this District demonstrates the straightforward and standard method for these STA matters. The case is especially relevant as it involved both Magistrate Sullivan, and AUSA Ari Goldstein (who also participated in the prosecution of Petitioner). In <u>United States v. Beverly</u>, U.S. Dist. LEXIS 62142 (Dist. of RI, 2015), the Government sought an Extension of Time for plea negotiations prior to indictment. Magistrate Sullivan granted a continuence for plea negotiations. When plea negotiations were unproductive, "a hearing was held before Judge Sullivan during which the Government moved, pursuant to Rule 48(a) of the Federal Rules of Criminal Procedure, to dismiss the complaint without prejudice because the grand jury could not be convened until the following [day]." Subsequent

- 26 -

to that dismissal by Magistrate Sullivan, the Government in turn
filed a new complaint and also filed an indictment. From the
Government's point of view, this type of approach successfully
navigated the STA respective to pre-indictment plea negotiations.
"Therefore, the Speedy Trial Act was not violated." Id. This
raises questions regarding the handling of Petitioner's case.
Qui bono? Is it adventageous for unceasing extensions to be
sought and utilized by the Government? Yes, for the very reasons
within this case, from the indictment waiver to the plea agree-
ment, to the subsequent unknowing waiver of constitutional and
non-jurisdictional claims occurring before the plea agreement.
Originally in this litigation, Petitioner read and considered
Beverly, and presumed that the prosecution in his case would
have conducted themselves similarly, that is to say, with no
bad faith or manipulative techniques, and instead to deal fairly
with the Defendant (innocent until proven guilty) with 'clean
hands' and in full candor to the Magistrate and Court. As such,
Petitioner believed (due to Beverly) that the Government really
did try to secure an Indictment. Per the Responses, that was
never the case. Failure to indict was not a 'failure' per se,
it was a purposeful and willful strategy by the Government to
achieve the conviction by other means, and entirely absent any
meaningful challenge by Counsel, as Petitioner's instant REPLY
and other submissions prove. When the aforementioned techniques
by the Government, their non-indictment gamesmanship as it were
are met with non-investigatorial and non-advocating Counsel,
the conviction is all but guaranteed. This conviction must be
overturned and the entire case fully dismissed.

## Prayer for Relief

WHEREFORE, in consideration of the facts, law, circumstances, and discussion herein and previously submitted, Petitioner humbly PRAYS the Honorable Court

1. **GRANT** the instant Motion under 28 U.S.C. §2255 and
   **DISMISS** the criminal case in its entirety; alternatively,

2. **ORDER** an **EVIDENTIARY HEARING**; alternatively,

3. **ISSUE** a **CERTIFICATE OF APPEALABILITY** in consideration of
   the numerous claims and issues upon which reasonable
   jurists could disagree;

and any additional **RELIEF** to which Petitioner may be entitled, deemed fair and equitable by the Honorable Court.

It is so prayed.

Respectfully submitted,

_____          20 FEB 19
ADAM COBB,                        DATE
Petitioner pro se

- 28 -

ATTACHMENT A

ATTACHMENT A

The following text is a point-by-point
refutation of the Government's two Replies

## Document 84

1.  P2, Lines 10-12. The Defendant was prejudiced in **many** ways.
    For example, denial of Due Process. When due process is dep-
    rived, the outcome does not matter. It destroys all confid-
    ence in all later proceedings, to include the outcome.

    It should not be considered an "achievement" when, as in this
    case, defense counsel has assisted or contributed to the dep-
    rivation of due process for his client.

2.  P4, Lines 1-8. (See also P5, Para. 1). "Several unauthorized
    electronic devices". Elsewhere (Dkt 93) the government discu-
    sses numerous cell phones. But they stop short in these five
    instances, that (1) the electronic devices were not newly ac-
    quired after the first police search of the house, (2) the cell
    phones themselves were not activated for current use on any
    cell phone network, (3) the only cell phone activated at the
    time of Petitioner's arrest was the one in his posession when
    he was trevelling and none of the older deactivated devices
    at his house, (4) there was no contraband data of any sort
    on the aforementioned deactivated devices, (5) the bail con-
    ditions violated as referred to in Lines 4-7, have nothing
    to do with the reasons stated by the government. Respective
    to contact from Petitioner to the other party, the Court

- 1 -

ultimately ruled that contact would not create any public safety factors.

3. P3-4, Lines 8-12. As stated in the Response on page 3, the "rights he was waiving" were not enumerated by the Magistrate, nor are they required to be. Ergo, any lack of knowledge of those rights falls squarely on the conduct of defense counsel regardless of the level of academic achievement of a defendant in a field other than the Law. "The defendant admitted that the facts the prosecutor recited were true". Counsel never provided any prior warning or legal advice regarding the Government's content and wording of the 'facts'. Petitioner was never shown, or had read to him by Counsel prior to the hearing any versions of the Government's assertion, neither did Petitioner have a written version of the same during the hearing to read and contemplate, rather than unexpectedly react to a set of statements for which he was never prepared. The only advice from Counsel was to 'say yes' and to 'agree' and that any arguing would 'make things go bad'. Petitioner's conduct at the hearing, to include his answers to the Magistrate were entirely at the direction of Counsel who had failed to prepare Petitioner for the hearing and failed to inform Petitioner exactly of the rights, benefits, and privilages he would simultaneously be waiving upon waiving the indictment. Had the presentment by the prosecution been a surprise to Counsel, then in that scenario Counsel failed to make oral motion to the Court, for a few minutes to go over it with

- 2 -

his client; simultaneously preserving the matter and prose-
cutor's conduct for the record.

4. P4-5, Lines 18-19 and footnote 3. Respective to ICAC and the
Government's reliance on that See the Opinion of Supreme Court
Justice Gorsuch in United States v Ackerman, 831 F.3d 1292
(10th Circuit 2016). Procedurally Petitioner is allowed to
reply to this as a rebuttal to a new element introduced by
the Government.

5. P5, Lines 4-7. The Response states that "Police requested and
obtained a search warrant for his home, which was executed on
March 5, 2015. The warrant authorized the seizure and search
of all electronic devices at the premises, including cell pho-
nes." The police were Rhode Island Police, and despite the foot-
note by the Government ("ubiquitous practice nationally.. to
cooperate on joint investigations") this Rhode Island investi-
gation was NOT a joint investigation, and no representation of
it being "joint" was made to, nor authorized by the Rhode Island
Judge who signed the Search Warrant. Futhermore, the date was
March **4th**. The seizure was for those at the premises, not
elsewhere, and did not include an arrest warrant for Petitioner
anywhere.

6. P5, Footnote 4. The Government cited the federal search warrant,
signed by Magistrate Judge Sullivan on March 18, 2015. This is
a search warrant for an iPhone illegally obtained in a non-
routine airport search/seizure in a custodial arrest event at
the behest of SA Richardson directing the Dallas Federal officers
to execute in Dallas Texas, a premises-based Warrant issued

- 3 -

by a Rhode Island Judge for a Rhode Island residence absent an
arrest warrant for the resident himself, in which the State
warrant made no mention of, nor provision for, any extrajuris-
dictional action by any officer. The iPhone was obtained not
as an element of a random stop, but in furtherance of an on-
going investigation, and absent a federal warrant. The iPhone
was searched in Dallas, and Petitoner asserts, elsewhere as
well. Counsel failed to obtain the iPhone and subject it to
the proper computer forensic analyses to prove the illegal
searches by law enforcement occuring prior to the issuance of
Magistrate Sullivan's March 18, 2015 search warrant. The inter-
nal data of the iPhone would have proven the Government's condu-
ct in respect to the phone, its data, and the copying of the
data by law enforcement officers/agents. Both the federal
search warrant and instant footnote err  in omission by failing
to provide an accurate and truthful description as to the
nature, circumstances, and events (both in RI and TX) respective
to the seizure of the iPhone and the implications of an arrest
having already occured. Otherwise, without an arrest having
already occured in Dallas, the seizure of the iPhone in the
original instance was an unauthorized, extrajurisdictional
expansion of the RI search warrant. There was no endorsement
of the RI warrant by any federal Magistrate or Judge in the
Northern District of Texas nor the District of Rhode Island.
7.  P6, Lines 2-4. In comparison on the previous page the Govern-

- 4 -

ment has stated (conceded) that the individual was a 17 yr old citizen of the United Kingdom, in this section that same individual is still the same age and contextually was of the age of consent of the sovereign nation of which she was a resident and citizen.

8. P6, Lines 9-14. The oversimplification by the Government is again an error of ommission or misrepresentation of events. The dynamic complexity of what transpired (1) from the commencement of the RI search to (2) SA Richardson analysing evidence "gathered to that point" to (3) SA Richardson knowlingly and purposefully forgoing legal channels (i.e., receiving a telephone warrant from a Judge or Magistrate either in Dallas or alternatively, within the Federal District of RI to authorize such action that would otherwise not be legal, due to jurisdiction and limitations of a RI state warrant which has full force and effect **only** within the geographical state of RI). SA Richardson "requested a border search of Cobb take place at the airport", however he has no judicial nor executive branch discretionary authority to so order.

9. P6, Lines 12-18. The Government has made assertions regarding Petitioner's copduct in interactions with Government agents in Dallas. These assertions are nothing more than heresay. There is no factual basis for these assertions and the Government has not submitted any evidence (audio tapes, video tapes or even sworn affidavits from any of the Dallas agents) as to the veracity and accuracy of these actions.

- 5 -

10. P6-8. There is a needless comingling of the UK citizen who
    is not a part of the convicted count in the instant case
    and (1) being a UK citizen is not a minor for the purposes
    of a US federal prosecution, and (2) appears only through
    indirect reference under relevant conduct of Petitioner
    (beyond the appearance of this yet again in the prosecution's
    position, it demonstrates Counsel's failings to have the
    foreign national non-minor removed entirely from these
    matters. This failure by Counsel led to the wrongful inclusion
    of this relationship in the relevant conduct). Through the
    use of comingling the Government is trying to establish the
    appearance of two victims, where due to the UK citizenship
    and age, that individual was entirely precluded from being a
    victim because statutorily any conduct with her could not
    meet the relevant fact or elements-of-the-case criteria to
    be the basis of a child pornography prosecution. See also
    P13, Lines 18-19 "two seperate minors". To this end, the
    prosecution devotes much of its response, including the
    entirety of page 7, to conduct between Petitioner and the
    UK citizen, whereas by comparison, alleged conduct by
    Petitioner to the Maryland resident refers to 28 words,
    only 7 of which are cited as a direct quote.

11. P9, Line 4. This conduct fails on its own terms/grounds
    in so far as the Government states that the nature of the
    communications were a "relationship" where in actuality they
    nothing more than mere communications. Futhermore, on Page 9

they insinuate that persuant to an interview with that indi-
vidual that she terminated communication. This too is factually
wrong. Within Lines 2-11 there is further evidence of Defense
Counsel constitutional ineffectivness for failing to challenge
or even investigate Government claims. See, Line 2-3, "The US
victim was later interviewed and indicated she posed and did
the particular described acts at the request of the defendant."
Defense Counsel never conducted an interview to verify the
Government assertions as to the contents of the interview and
her testimony prior to ruling out proceeding to trial. That
is a clear failure to investigate. The identity and whereabouts
of this individual were known to the Government and said indi-
vidual would be subject to interview and deposition had Defen-
se Counsel so requested. These two elements, regarding the
UK citizen and Maryland individual, establish that Counsel's
one sided advice to not only not proceed to trial but to furt-
hermore waive an indicement were not based on **any** independant
investigative interview. In constructing the "defense" Counsel
never separated the metaphorical 'wheat from the chaff' to
determine the **actual** strength of the Government's case. Defense
Counsel did not engage in adversarial conduct in this most
critical of matters, namely to interview the accuser. The
Constitution provides that the accused has the right to face
their accuser. Without investigation, Defense Counsel waived
this having determined that Petitioner's constitutional rights
were unecessary.

12. P9, Line 7. The Government **again** refers to the "unknown
    receipient". To fulfil the elements of the charge there
    needs to be an indentification that any electronic trans-
    mission of contraband did in fact have a successful, doc-
    umented, and identifiable place or person of receipt.
    This position is an absolute fraudulency in that for the
    Government's case to commence there had to be an individual
    whose identity was known at some point to law enforcement
    whereupon the criminal information could be based. If there
    is no evidence of receipt, or if the recipient is unknown,
    **then there is no evidence.** An "unknown" individual cannot make
    an accusation nor submit evidence to the Government without
    also revealing their identity even if it were only to clear
    the name of the receipient. Moving forward in Petitioner's
    case, that same receipient would need to be produced for
    purposes of availability for interview by Defense Counsel
    as well as being made available for evidentiary hearings and
    trial. The Government cannot make a quasi-identification of
    there being a receipient, yet in the same breath claim that
    said receipient is unknown to them. Furthermore, this tech-
    nique cannot be used as a profalactic to protect the "unknown
    recipient" from federal prosecution and use his his testimony
    in the case against Petitioner.

How this applies in the Ineffective Assistance of Counsel analy-
sis is that the Government **did know** this persons identity, were

- 8 -

required to provide that name to Defense Counsel as a
potential witness who would testify against his client and
reveal any agreements with the "unknown receipient's"
attorney respective to supplying evidence or testimony
against Petitioner, quid pro quo, in return for a promise
of non-prosecution. None of this occured as a wilful act
of the prosecution, or alternatively, this person's ident-
ity was informall known to Counsel and Counsel elected not to
investigate or interview "unknown receipient" and to confirm
through examiniation of cell phone records that (1) his client
(Petitioner) did send files to this individual, (2) Petitioner
knew this individual, (3) that both Petitioner and "unknown
receipient" acted in good faith and without malice, and (4)
that "unknown receipient" also did not believe that there was
any illegality in the files or the receipt thereof otherwise
he would have reported the matter to law enforcement rather
than wait for law enforcement to contact him. The above 4 points,
if not based on identification as provided by the Government
presumably could have still been made by Counsel based exclu-
sively on the identification provided by his client (Petitioner)
or through additional forensic examination of cell phone serv-
ice provider data.

13. P9, Line 7. In respect to the 4 photos send to an "unknown
receipient" (and 2 more the following day) Petitioner sent
such photo's under best knowledge and contemperanious good
faith that subject of said photo's was of legal age for all
intents and purposes. These 6 images were sent only after

- 9 -

the subject the subject of the photography, of majority age
in her home state, specifically authorized Petitioner to
make screen capture files and only with those two collabrotive
points did Petitioner believe that the transfer of such
materials was fully authorized and ergo, legal.

14. P13, Line 14-16. The Government has engaged in an exaggerated
speculation to which no evidence exists, such as where the
Government asserts "an indictment would be simple to obtain
in this case", further exaggerating that "this Court knows"
that to be a fact. The record shows the Court accepted a
guilty plea pro forma after initial screenings and the
management of the proceedings by Magistrate Sullivan. The
Court has no direct knowledge about the ease to obtain an
indictment not the "prodigeous strength of the evidence"
alleged by the Government. Upon entering a plea, a defendant
removes any such burden of evidence, examination and consti-
tutionality of all previous proceedings from the Court.

15. P14, Lines 3-7. The Government alledges any and all delay
in going to a Grand Jury was at the request of Defense Counsel.
The evidence and the record prove otherwise. The requests for
extensions "to indict" were exclusively authorized by the
Office of the US Attorney and **not** Defense Counsel. Furthermore,
they were exclusively requested for time to seek indictment
and not plea negotiations as falsely stated by the Government
in this excerpt.

16. P16, Lines 10-13. The Government states "no search was made

- 10 -

until the search warrant was obtained". The Government has
provided **no proof** for this assertion. Alternatively, Defense
Counsel never challenged the Government on this issue, the
lack of evidence thereof nor independant forensic examination
of the iPhone to establish otherwise. They have not provided
video/audio documentation of events in Dallas, nor affidavits
of the officers involved, to confirm any authorization given
by Petitioner for iPhone searches at the Dallas airport. Neither
has the Government provided evidence in the negative by either
data arising from the RISP forensic examination nor affidavit
from that examiner to confirmedly establish there was no access
to the phone at any time between Petitioner's departure from
the Dallas interview area on 4 March, 2015, up to and including
the actual authorization by Magistrate Sullivan in the search
warrant application on 18 March, 2015.

# Certificate of Service

I, ADAM COBB, hereby declare and affirm under penalty of perjury and in accordance with 28 U.S.C. §1746 that the foregoing is a true and accurate document to the best of my knowledge, understanding, and recollection, and that a true copy of same has been filed with the Office of the Clerk, and served upon the Office of the United States Attorney via the United States Postal Service first-class mail with prepaid postage affixed thereunto.

Placed in the U.S. Mail on this date: _21 Feb 19_ .

_____
ADAM COBB

Mailing Address:

ADAM COBB
# 09925-070
Federal Medical Center
Post Office Box 14500
Lexington, KY 40512
(Antaeus Housing Unit)

* **NOTE:** Pro se Petitioner ADAM COBB has no access to PACER, nor to the ECF system. All data to and from the United States District Court; Office of the Clerk; and/or the Office of the United States Attorney shall be conducted by postal service via the United States Postal Service.

Per Bureau of Prisons/FMC Lexington regulations, Pro se Petitioner ADAM COBB has no access to Overnight Mail service, nor Two-Day Mail service, nor any mail or parcel service by or through private companies, e.g., Federal Express, U.P.S., D.H.L., et al.